**Eddie BETHEA, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 8460.**

District of Columbia Court of Appeals.

Argued May 6, 1975.

Decided Sept. 27, 1976.

Gallagher, J., filed a statement of reasons for voting for rehearing en banc in which Kelly, Fickling, and Mack, JJ., joined.

Joel M. Finkelstein, Washington, D.C., with whom J. Steven Lempel, Washington, D.C. was on the brief, both appointed by the court, for appellant.

Jonathan B. Marks, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty. and John A. Terry, Albert H. Turkus, and Richard L. Cys, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEBEKER, YEAGLEY and HARRIS, Associate Judges.

HARRIS, Associate Judge:

This is an appeal from a conviction of first-degree murder in which the defense of insanity was unsuccessful. Appellant contends that the trial court erred (1) in refusing to instruct the jury according to both the American Law Institute's standard for an insanity defense and the principle of "diminished capacity"[1] as adopted (the latter by dicta) in *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (en banc), and (2) in refusing to charge the jury that the government had the burden of proving appellant's sanity beyond a reasonable doubt. While we adopt a variation of the ALI standard for prospective application of the District of Columbis Court system, we conclude that the disputed instructions were not erroneous, and accordingly affirm.

## I. THE FACTS

On June 29, 1973, appellant took a bus to his estranged wife's office. Following an argument there, he shot her five times at close range. Soon thereafter, he was apprehended without significant resistance in an adjoining office. He was charged in a single-count indictment with first-degree murder. D.C.Code 1973, § 22-2401. Pursuant to a pretrial motion by the government, he was ordered to undergo psychiatric examination at Saint Elizabeths Hospital.[2] The hospital's staff concluded (1) that appellant was suffering from "no mental disorder", (2) that he was competent to stand trial, and (3) that the examination had yielded negative results under both the *Durham* and the *Brawner* tests for criminal exculpability.[3]

Appellant's defense was based on the related assertions that at the time of the shooting his mental condition was such as to amount to insanity, or, in any event, to preclude a finding of the degree of mens rea required for the offense.[4] He did not take the stand, but relied upon the testimony of both lay and expert witnesses to explain his condition and the circumstances leading up to and at the time of the incident. The lay witnesses testified that appellant's behavior on that day appeared somewhat irrational.[5] Dr. Jesse Rubin, a

---

1. We use the term "diminished capacity" as an abbreviated characterization of the concept involved. *See* note 41, *infra*, and the accompanying text.

2. Prior to the trial, appellant indicated that he intended to raise the defense of insanity. *See* D.C.Code 1973, § 24-301(j).

3. *Durham v. United States*, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954); *United States v. Brawner*, *supra*. The trial court's order specifically directed the hospital to examine appellant in accordance with the standards of both decisions. The staff concluded that "the alleged offense, if committed by him was not the product of a mental disease or defect;

nor as the result of a mental disease or defect did he lack substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law."

4. Conviction of first-degree murder requires proof that at the time of the killing the perpetrator was of "sound memory and discretion", and committed the act with a purposefulness accompanied by "deliberate and premeditated malice". D.C.Code 1973, § 22-2401.

5. The arresting officers and several of the victim's fellow-employees indicated that appellant remained at the scene of the shooting despite the availability of an avenue of escape, that he offered little resistance when arrested, and

private psychiatrist (who had spent less than three hours with appellant and whose knowledge of the facts was limited to appellant's version thereof), testified that appellant had been under severe emotional stress and suffered from what the doctor diagnosed as a "hysterical neurosis of a dissociative type."[6]

The government sought to rebut the claim of insanity with the testimony of several experts and certain acquaintances and relatives of Eddie and the late Barbara Bethea. Their testimony suggested a more mundane explanation for appellant's behavior. The couple's marital relationship had deteriorated throughout 1972, and even after the separation they continued to have stormy and occasionally violent arguments concerning appellant's financial support of his wife and his suspicions of her infidelity. Drs. Thomas Polley and Robert

Robertson challenged Dr. Rubin's diagnosis of "hysterical dissociative reaction", and testified that in any event appellant had not been suffering from any mental disorder which would have significantly impaired his capacity for self-control.[7]

■ Appellant unsuccessfully moved for a judgment of acquittal both at the close of the government's case and after all of the evidence was in. The court, however, did agree that the jury should be instructed on the lesser-included offenses of second-degree murder and manslaughter.[8] Appellant requested that the charge to the jury be framed in accordance with the principles of *United States v. Brawner, supra*.[9] That request was denied on the ground that *Brawner* had been released subsequent to the effective date of the Court Reorganization Act,[10] and therefore the *Durham-McDonald* standard[11] remained the law

---

that he spoke in a low, often incomprehensible manner, saying that he had shot his wife, that he "had to do it", and that he wanted to go to jail.

6. Dr. Rubin explained that dissociative reaction may be described as an "involuntary, psychogenic, that is, emotional" disorder or loss of function. He testified that the illness is characterized by "alterations in the state of consciousness," and may produce symptoms such as amnesia. The condition apparently is directly related to the underlying existence of "severe emotional conflict," and its symptoms might be expected to "begin and end suddenly in emotionally charged situations."

7. Dr. Polley, a clinical psychologist for Saint Elizabeths Hospital, described appellant as emotionally impoverished, but found no indication of dissociative reaction. He concluded that there had been no significant distortion of appellant's thought processes, and that at the time of the shooting appellant had been functioning within the range of a "normal psychological state." Dr. Robertson, a psychiatric consultant to Saint Elizabeths Hospital, explained that there are degrees of dissociative reaction, but testified that the condition should not significantly interfere with behavioral controls. He disputed Dr. Rubin's diagnosis of dissociative reaction, and concluded that at the time of the incident, appellant was not suffering from any mental disorder and was aware of what he was doing.

8. *See* D.C.Code 1973, §§ 22–2403, –2405. We note that there was no competent evidence to warrant an instruction on manslaughter. The defendant did not testify; the only testimony as to his version of the shooting incident came from the defense psychiatrist. It was hearsay, and provided no factual predicate for the proper consideration of manslaughter by the jury.

9. In *Brawner*, the circuit court departed from *Durham v. United States, supra* note 3, and adopted prospectively the major portion of the American Law Institute's standard for the insanity defense:

A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Model Penal Code § 4.01(1) (Final Draft, 1962).

Appellant also sought to have the jury instructed in accordance with the doctrine of "diminished capacity" as adopted by the *Brawner* court. 153 U.S.App.D.C. at 30–34, 471 F.2d at 998–1002.

10. District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L.No. 91–358 (July 29, 1970) (effective Feb. 1, 1971).

11. The *Durham* court had adopted the following standard: "[A]n accused is not criminally responsible if his unlawful act was the

for the District of Columbia courts. *See M.A.P. v. Ryan*, D.C.App., 285 A.2d 310 (1971). The court accordingly based its jury instructions on the earlier principles, and further charged, pursuant to D.C. Code 1973, § 24–301(j), that the accused had the burden of establishing by a preponderance of the evidence his asserted exculpating mental abnormality. Appellant duly objected to those instructions. After less than three hours of deliberation, the jury returned a verdict of guilty of first-degree murder.

## II. THE INSANITY STANDARD AND THE DOCTRINE OF *M.A.P. v. RYAN*

Appellant's first claim of error is the trial court's refusal to abandon the *Durham-McDonald* formulation of the insanity standard in favor of the ALI test which had been adopted by the *Brawner* court. The trial court concluded that under the principles enunciated in *M.A.P. v. Ryan, supra, Durham-McDonald* remained the controlling rule for the District of Columbia court system, and that it was not at liberty to substitute the *Brawner* test. We agree.

In *M.A.P. v. Ryan* we addressed the issue of the impact of the Court Reorganization Act upon the relationship between our court system and the purely federal tribunals which share the same geographical jurisdiction. The Act declared this court to be the "highest court [in] the District of Columbia", and eliminated the prior

power of the United States Court of Appeals to review our judgments. D.C.Code 1973, § 11–102. Consistent with that grant of jurisprudential independence, in *M.A.P. v. Ryan* we declined to follow a decision by the circuit court which had been issued after the effective date of the statutory reorganization.[12] While we declared that post-reorganization decisions by the circuit court would be "entitled to great respect", we explained (285 A.2d at 312):

> [W]e are not bound by the decisions of the United States Court of Appeals rendered after [February 1, 1971]. With respect to decisions of the United States Court of Appeals rendered prior to February 1, 1971, we recognize that they, like the decisions of this court, constitute the case law of the District of Columbia. As a matter of internal policy, we have adopted the rule that no division of this court will overrule a prior decision of this court or refuse to follow a decision of the United States Court of Appeals rendered prior to February 1, 1971, and that such result can only be accomplished by this court en banc. [Footnote omitted.]

*M.A.P. v. Ryan* thus compelled the trial court's conclusion that it was not bound by the circuit court's decision in *United States v. Brawner, supra.* It apparently is appellant's position, however, that because the *Brawner* court abandoned its earlier decision in *Durham*, that pronouncement effectively removed *Durham* from the rolls as *stare decisis,* and thus left the trial court

product of mental disease or mental defect." 94 U.S.App.D.C. at 240–41, 214 F.2d at 874–75 (footnote omitted). This test was further illuminated in *McDonald v. United States*, 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (en banc): "[A] mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls."

12. In *M.A.P. v. Ryan*, we held that in light of the precautionary measures prerequisite to the filing of a delinquency petition, the absence of a hearing on the issue of probable

cause did not violate the principles of due process. The juvenile's petition for a writ of mandamus to compel such a hearing was denied, despite a post-reorganization decision by the circuit court suggesting that probable cause hearings may be required under such circumstances. *Brown v. Fauntleroy*, 143 U.S.App.D.C. 116, 442 F.2d 838 (1971). It was concluded that as a result of the Court Reorganization Act this court occupies a position analogous to that of the highest court of a state, and possesses the authority to exercise its own judgment with respect to such constitutional questions. 285 A.2d at 312.

free to adopt the *Brawner* test prior to consideration of the question by this court. We disagree.

■ Neither *M.A.P. v. Ryan* nor its progeny has examined the question of what, if any, precedential effect may be ascribed to those decisions of the circuit court which it overturns subsequent to court reorganization. *Cf. In re Hodges,* D.C. App., 325 A.2d 605 (1974). The problem of such "derelict" precedent falls between the separate principles of *M.A.P. v. Ryan* which (1) accord binding effect to pre-February 1971 decisions, and (2) give "great respect" to those decisions announced after February 1, 1971. We conclude that consistent with the policy considerations underlying the statutory provisions, the principles of *M.A.P. v. Ryan* should be supplemented by the corollary rule that regardless of their fate at the hands of the circuit court after February 1, 1971, decisions rendered by that court prior to such date remain valid and binding case law in the District of Columbia court system until such time as they may be modified or set aside by this court. *Cf. Hughes v. United States,* D.C.App., 308 A. 2d 238, 242 n. 12 (1973).

■ The flaw in appellant's argument is that if *Brawner* is to be read as eliminating *Durham* as *stare decisis,* the circuit court would be afforded a negativing authority which would be inconsistent with the spirit and letter of the Court Reorganization Act and contrary to the principles enunciated in *M.A.P. v. Ryan.* Unquestionably the power to say what the law *is not* is as significant as the authority to declare what the law *is.* In our system of jurisprudence, which so greatly values the doctrine of *stare decisis,* the ability to shape and control the precedential foundations of the law is essential to the independence of a particular judicial structure. We therefore reject the notion that the respect to be accorded by us to decisions issued by the circuit court after February 1, 1971, may be stretched to include a princi-

ple of deference to that court's determinations that its own earlier decisions shall no longer be of any precedential value.

Moreover, the need for preserving the controlling nature of cases such as *Durham* is supported by the institutional impact of a contrary conclusion. A rule which would deny binding authority to post-reorganization decisions of the circuit court, while recognizing that tribunal's authority to eliminate pre-1971 precedents, would pose a very real threat to the stability of our judicial system. Thus, a trial court not bound by the later cases yet unrestrained by the principles of the derelict precedent would be deprived of guidance, and its judges would be free to adopt variant and inconsistent rules. Similarly, to allow post-reorganization decisions of the circuit court to displace the previously shared case law would create an undesirable uncertainty with respect to the intervening decisions of this court which may have been grounded upon the disputed precedent.

■ We do not overlook the unique legal and political circumstances which distinguish the District of Columbia from other jurisdictions, and we recognize the desirability and necessity of a spirit of cooperative coexistence between the two separate court systems which operate within its boundaries. Such considerations, however, must take a secondary position to our obligation to fulfill the mandate of the Court Reorganization Act by preserving the autonomous authority of our judicial structure. *Cf. United States v. Thompson,* 147 U.S.App.D.C. 1, 10–11, 452 F.2d 1333, 1342–43, *cert. denied,* 405 U.S. 998, 92 S. Ct. 1251, 31 L.Ed.2d 467 (1972). This responsibility requires that we not accord the circuit court the capacity to control the development of our law indirectly by altering the roots from which it has evolved. We affirm the trial court's determination that the *Durham-McDonald* formulation remained the controlling standard for an insanity defense in the Superior Court de-

spite its abandonment in *Brawner*. As the charge to the jury was framed in accordance with the language of the controlling earlier decisions, the instructions were not erroneous.[13]

## III. THE EVOLUTION OF THE IN-SANITY STANDARD

Our affirmance of the trial court's conclusion that the *Durham-McDonald* formulation remained the controlling standard for the insanity defense in the trial of this case does not resolve the broader question of the proper future interpretation of this important aspect of criminal responsibility.[14] Both appellant (in this case) and the government (in *Brawner*) have argued that the ALI formulation which was adopted in *Brawner* would better suit the objectives of our criminal justice system. We recognize that the law cannot remain static; it must be permitted to evolve with the changing complexion of society and the developing sciences. After careful consideration, we conclude that there is merit to the positions urging a reevaluation of the standard by which we are to determine the existence of an exculpatory mental condition.

The idea that an individual may be excused from the standards of conduct demanded by society of its members by reason of psychiatric abnormality is relatively ancient. We need not trace the historical origins of the insanity defense in any depth; the subject has been exhaustively considered elsewhere. *See e.g., Durham v. United States, supra,* 94 U.S.App.D.C. at 235–40, 214 F.2d at 869–74; *United States v. Freeman,* 357 F.2d 606, 615–22 (2d Cir. 1966); *United States v. Currens,* 290 F.2d 751, 763–67 (3d Cir. 1961). It is sufficient to note that the defense arises from our heritage of fundamental moral precepts which condition responsibility (*i.e.,* accountability) for one's behavior on the existence of an effective choice of conduct.[15] *See United States v. Brawner, supra,* 153 U.S.App.D.C. at 17, 471 F.2d at 985. Absent circumstances which in the aggregate satisfy the concept of "free will", an individual transgressor is dealt with in a manner which is significantly different from the response accorded the ordinary offender.[16]

The determination of whether an accused was sufficiently possessed of the necessary free will to be held criminally responsible traditionally has turned on the existence of one or more of three interrelated capacities: cognition, volition, and control over one's own acts. Although the earlier formulae varied in construction, the critical question for the jury has been whether at the time of the act the accused lacked the particular attributes deemed to

13. For a more detailed recitation of the relevant instructions, *see* note 70, *infra.*

14. The issue of the impact of the revised insanity standard announced in *Brawner* was noted by us without further comment in *Hughes v. United States, supra,* 308 A.2d at 242 n. 12.

15. "[T]he basic postulate of our criminal law . . . [is] 'a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.' . . . An insane man is not held responsible, because he has not a criminal mind in respect to the act he committed. That philosophy has never changed . . . . The problem . . . is not one of philosophy. It is one of translating the accepted philosophy into practical rules of action for everyday use in the courtroom." *Carter v. United States,* 102 U.S.App.D.C. 227, 235, 252 F.2d 608, 616 (1957) (footnotes omitted).

16. "The criminal law, it has been said, is an expression of the moral sense of the community. The fact that the law has, for centuries, regarded certain wrong-doers as improper subjects for punishment is a testament to the extent to which that moral sense has developed. Thus, society has recognized over the years that none of the three asserted purposes of the criminal law—rehabilitation, deterrence and retribution—is satisfied when the truly irresponsible, those who lack substantial capacity to control their actions, are punished." *United States v. Freeman, supra,* 357 F.2d at 615.

constitute the essential aspect of free will.[17]

The landmark decision in *Durham v. United States, supra,* marked the beginning of two significant changes in the evolutionary course of the law.[18] The first was an effort to accommodate advances in the field of psychiatry by moving away from the artificial compartmentalization of the mind toward an inquiry into the "whole man". *See Durham v. United States, supra,* at 237 & n. 30, 214 F.2d at 871 & n. 30; *see also United States v. Currens, supra,* at 772. *Cf. Pope v. United States,* 372 F.2d 710, 736 (8th Cir. 1967) (en banc), *vacated on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). Thereafter, examination of the accused's mental condition was not to be focused solely on the narrow concepts of cognition, volition, and control, but rather would be structured to permit expert witnesses to give the jury the full benefit of their observations and conclusions concerning the existence and significance of an asserted deficiency. *See Washington v. United States,* 129 U.S.App.D.C. 29, 30–31, 390 F.2d 444, 445–46 (1967); *United States v. Freeman, supra,* 357 F.2d at 621. The second and perhaps more important result of *Durham* was a shift of adjudicatory emphasis from the existence of a mental impairment as a simple fact to the nature of the relationship between the deficiency and the illegal behavior. The *Durham* standard, which has provided the foundation for the current majority approach to the issue of responsibility, was deceptively simple in construction (94 U.S.App.D.C. at 240–41, 214 F.2d at 874–75):

> [A]n accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.

[Footnote omitted.]

While the substantive theory of criminal responsibility continues to receive attention,[19] the post-*Durham* debate has focused primarily on the proper implementation of the "disease-product" doctrine. The chronic problem has been the elusiveness of a formulation which would provide a medically meaningful structure within which the experts may render accurate and relevant testimony, while preserving for the jury its full authority to find the facts and reach their legal-moral conclusion on the ultimate issue of responsibility. *See United States v. Chandler,* 393 F.2d 920, 925–26 (4th Cir. 1968) (en banc); *see also*

17. The beginning of the modern theory of criminal responsibility usually is traced to the cognitive formulation of the celebrated *M'Naghten's Case,* 10 Clark and F. 200, 8 Eng.Rep. 718, 722 (H.L. 1843). Subsequent standards have stressed volition and control. *See, e. g., Davis v. United States,* 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750 (1897); *Smith v. United States,* 59 App. D.C. 144, 145, 36 F.2d 548, 549 (1929); *United States v. Currens, supra,* 290 F.2d at 774. These elements have been combined in the ALI standard. *Cf. Pope v. United States,* 372 F.2d 710, 733–39 (8th Cir. 1967) (en banc), *vacated on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968).

18. The developments in *Durham* had their harbinger in the so-called "New Hampshire rule." *See State v. Jones,* 50 N.H. 369 (1871); *State v. Pike,* 49 N.H. 399 (1869).

19. Among the possible alternatives to the *Durham* and ALI standards have been proposals to abolish insanity as a separate defense [*see, e. g.,* S–1, Chapter 3, Subchapter C, Sec. 522 (94th Cong., 1st Sess., Jan. 15, 1975)], and various efforts to shift to a more subjective standard of criminal responsibility [*e. g.,* the so-called "jury justice" system provided in Alternative (a) to § 4.01(1) of the Model Penal Code (Tent. Draft No. 4, 1955); *see United States v. Brawner, supra,* 153 U.S.App.D.C. at 56, 70–74, 471 F.2d at 1016, 1030–34 (Brazelon, C. J., concurring in part, dissenting in part)]. We share the conclusions of the *Brawner* majority that so radical a change as abolition should be left to the legislature (*id.* at 17–18, 471 F.2d at 985–86), and that the notion of setting a jury at large to render ad hoc determinations of responsibility with no meaningful guidance is fundamentally unsound (*id.* at 21, 471 F.2d at 989). (*Cf. Washington v. United States, supra,* 129 U.S.App.D.C. at 41 n. 23, 390 F.2d at 452 n. 23.

King v. United States, 125 U.S.App.D.C. 318, 324–25, 372 F.2d 383, 388–89 (1967).

The circuit court has, on several occasions, sought to refine and explain the *Durham* standard. In *Carter v. United States,* 102 U.S.App.D.C. 227, 252 F.2d 608 (1957), the court addressed the nature of the causal relationship between the asserted impairment and the criminal act. It explained that despite the inherently unique aspects of the insanity issue, the analysis to be made by the trier should adhere to the conventional and familiar form (*id.* 94 U.S.App.D.C. at 236, 252 F.2d at 617):

> The short phrases "product of" and "causal connection" are not intended to be precise, as though they were chemical formulae. They mean that the facts concerning the disease and the facts concerning the act are such as to justify reasonably the conclusion that "But for this disease the act would not have been committed."

The concept of "mental disease or defect" had been examined earlier in *Mc-Donald v. United States,* 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (en banc).[20] The court emphasized that the medical and legal notions of sanity were not necessarily congruent (*id.* at 124, 312 F.2d at 851):

> [N]either the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. What psychiatrists may consider a "mental disease or defect" for clinical purposes, where their concern is

treatment, may or may not be the same as mental disease or defect for the jury's purpose of determining criminal responsibility.[21]

*See King v. United States, supra,* 125 U.S. App.D.C. at 322–23, 372 F.2d at 387–88; *cf. Millard v. Harris,* 132 U.S.App.D.C. 146, 149–51, 406 F.2d 964, 967–69 (1968). As a legal predicate to possible exculpation, the necessary psychiatrict circumstances were defined in *McDonald* as follows (114 U.S.App.D.C. at 124, 312 F.2d at 851):

> [A] mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls.

The most serious criticism of the disease-product doctrine was that the *Durham* standard was "subject to a misinterpretation as prescribing a diagnostic, rather than moral or societal, test." *United States v. Chandler, supra,* at 925. It was charged that because the *Durham-Mc-Donald* formulation elevated the medical evidence to a position of critical relevance with respect to the determination of both of the predicates of responsibility (*i.e.,* the existence of an impairment and the nature of its relationship to the condemned behavior), it had the practical effect of shifting the resolution of the ultimate issue from the jury to the expert witnesses. *See United States v. Freeman, supra,* 357 F.2d at 621–22. The circuit court responded in

---

20. The difference between "disease" and "defect" had been defined in *Durham v. United States, supra,* 94 U.S.App.D.C. at 241, 214 F.2d at 875: "We use 'disease' in the sense of a condition which is considered capable of either improving or deteriorating. We use 'defect' in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease." In our view, these definitions are of limited assistance because of the unwarranted extent to which they compartmentalize the two concepts. However, the distinction

between "disease" and "defect" is peripheral to the problem of improving the standard by which criminal responsibility is to be assessed.

21. "The divergence between law and psychiatry is caused in part by the legal fiction represented by the words 'insanity' or 'insane', which are a kind of lawyers' catchall and have no clinical meaning . . . . The legal definition of insanity is almost impossible to come upon." J. Biggs, The Guilty Mind, 117 (1955) (Chief Judge Biggs, author of the Third Circuit opinion in *United States v. Currens, supra*).

*Washington v. United States, supra,* by announcing guidelines for the use of expert testimony and establishing a prohibition against the use of certain causal terminology.[22]

It is against this backdrop that we examine that portion of the ALI standard which was adopted in *United States v. Brawner, supra* (153 U.S.App.D.C. at 3, 471 F.2d at 971):

A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.[23]

The circuit court's opinion in *Brawner* does not suggest an intention to repudiate the whole of *Durham* and its progeny. To the contrary, the court acknowledged that there is little distinction between the substantive content of the ALI standard and that which underlay the *Durham-Mc-*

*Donald* formulation. *Id.* at 21–22, 37 n. 79, 471 F.2d at 989–90, 1005 n. 79. *Accord,* Report of the President's Commission on Crime in the District of Columbia, p. 990 (1966). The court expressly retained the *McDonald* definition of "mental disease or defect", and reiterated the concern expressed in *Washington v. United States, supra,* regarding the need to segregate the legal-moral domain of the lay trier from the medical sphere of the expert witness. *Id.* at 14–15, 35, 38–39 & n. 82, 471 F.2d at 982–84, 1003, 1006–07 & n. 82. Given the previous modification of *Durham* by the incorporation of the notion of substantiality in *McDonald v. United States, supra,* it seems to us that the adoption of the ALI standard in *Brawner* fairly may be characterized as a relatively modest revision of the insanity standard, in recognition of existing principles and philosophy. *See Wade v. United States,* 426 F.2d 64, 69 (9th Cir. 1970) (en banc); *United States v. Smith,* 404 F.2d 720, 726 (6th Cir. 1968). Appellant asks us to join in adopting such a revision.[24]

22. While the *Washington* court emphasized that the experts must be encouraged to communicate in a manner comprehensible to the lay trier, it concluded that the exclusion of all medical labels would be both impractical and unrealistic. As to the causal analysis, however, its restrictions were more specific: "A strong minority of this court has consistently advocated that psychiatrists be prohibited from testifying whether the alleged offense was the 'product' of mental illness, since this is part of the ultimate issue to be decided by the jury. We now adopt that view. The term 'product' has no clinical significance for psychiatrists. Thus there is no justification for permitting psychiatrists to testify on the ultimate issue. Psychiatrists should explain how defendant's disease or defect relates to his alleged offense, that is, how the development, adaptation and functioning of defendant's behavioral processes may have influenced his conduct. But psychiatrists should not speak directly in terms of 'product', or even 'result' or 'cause'." 129 U.S.App.D.C. at 40–41, 390 F.2d at 455–56. *Compare Harried v. United States,* 128 U.S.App.D.C. 330, 389 F.2d 281 (1967).

23. The ALI standard reflects a preference for the word "criminality" as opposed to "wrongfulness", but sanctions the alternative

use of the latter word. As discussed *infra,* we share the circuit court's preference for "wrongfulness".

24. Appellant was concerned lest the broad policy expressed in *M.A.P. v. Ryan,* (which, as explained in Part II of this opinion, did not contemplate the situation presented in this case) might inhibit adoption of the ALI standard by a division of the court. Accordingly, he moved to have the case heard en banc initially. That motion was denied by a vote of 6–1, with Judge Gallagher abstaining. Nearly 16 months later, Judge Gallagher called for another vote as to whether the case should be heard en banc. The vote against that proposal was 5–4.

As to the nature of the action we take today, the following statement by *Durham's* author in his separate opinion in *Brawner* is instructive:

But the adoption of this new test is largely an anti-climax, for even though *Durham's* language survived until today's decision, the significant differences between our approach and the approach of the ALI test vanished many years ago.

*United States v. Brawner, supra,* 153 U.S. App.D.C. at 42, 471 F.2d at 1010 (Bazelon, C. J., concurring in part and dissenting in part).

The *Brawner* court justified its substitution of the ALI formulation for the *Durham* test on two general grounds. First, it concluded that *Durham* had overcompensated for the previous inhibitions on meaningful participation by expert witnesses, and it observed that despite the additional guidance of the *Carter, McDonald,* and *Washington* opinions, *supra,* the core question of whether a particular criminal act was the product of a mental impairment was an equation too easily annexed by the medical witnesses. *United States v. Brawner, supra,* 153 U.S.App.D.C. at 13–15, 471 F.2d at 981–83. The circuit court concluded—and we agree—that the ALI test is preferable, partly because it avoids the troublesome productivity construction, and partly because it counters the potentially overriding influence of the experts by shifting the focus from the direct question of whether the condition "produced" the act to the issue of whether the condition substantially impaired the individual's capacity to obey the law.[25] *Id.* at 13, 471 F.2d at 981. Second, the circuit court recognized that almost all of the other federal circuits had adopted ·standards which tracked or conformed to the ALI test, and that significant jurisprudential benefits would accrue from the use of a common terminology and analytical structure. *Id.* at 11, 16, 471 F.2d at 979, 984. We concur in the conclusion that *Durham's* somewhat simplistic formula has outlived its usefulness, and, for reasons which will be developed below, adopt prospectively a slightly modified version of § 4.01(1) of the Model Penal Code.

The issue of criminal responsibility requires the application of a legal standard which is capable of simultaneously serving several diverse objectives. *Cf. United States v. Currens, supra,* 290 F.2d at 772–74. First, the standard must accurately reflect the underlying principles of substantive law and community values. Second, it must be phrased in such a manner as to be both comprehensible to all of the diverse participants in the adjudicatory process and conducive to the maximum flow of information relevant to the ultimate decision to be made. This objective is made all the more difficult to achieve by virtue of the necessity for phraseology which will be meaningful to a variety of constituents, including those ·expert principally in the law, those expert principally in the sciences, and those, like the parties and the jurors, who presumably are bereft of any relevant expertise. Finally, the standard must be such as to preserve to the trier (be it judge or jury) its full authority to render the ultimate conclusion on the issue of responsibility. *Cf. United States v. Smith, supra,* 404 F.2d at 726. As the Second Circuit has observed (*United States v. Freeman, supra,* 357 F.2d at 619–20):

> At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. . . . But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts.

25. The drafters of the ALI standard inserted the concept of substantiality to accommodate the realities of the psychiatric sciences. *See* Comments, Model Penal Code, Tent. Draft No. 4, at 158 (1955) : "In addressing itself to impairment of the cognitive capacity, *M'Naghten* demands that impairment be complete; the actor must *not* know. So, too, the irresistible impulse criterion presupposes a complete impairment of capacity for self-control. The extremity of these conceptions is, we think, the point that poses [the] largest difficulty to psychiatrists when called upon to aid in their administration. . . . Nothing makes the inquiry into responsibility more unreal for the psychiatrist than limitation of the issue to some ultimate extreme of total incapacity, when clinical experience reveals only a graded scale with marks along the way. . . . The law must recognize that when there is no black and white it must contend itself with different shades of gray."

Measured by these criteria, the provisions of the Model Penal Code offer a significant improvement over the *Durham* standard. *Cf. United States v. Freeman, supra,* at 623. While both formulations arise from the common substantive concept which bars punishment where there is shown a sufficient connection between the illegal conduct and a cognizable mental impairment, *Durham* expressed the relationship in a terse formula which has proved to be both deficient in its comprehensibility and adverse in its impact upon the allocation of adjudicatory authority. *See United States v. Brawner, supra,* 153 U.S.App. D.C. at 8–11, 471 F.2d at 976–79; *United States v. Currens, supra,* 290 F.2d at 772–74.

Much of the difficulty with the *Durham* test arose from its use of the word "product" to express the causal relationship between the accused's mental condition and the charged act. This concept was clinically meaningless to the medical experts, and proved misleading to lay jurors who apparently attached a special scientific significance to the term. *See United States v. Chandler, supra,* 393 F.2d at 925–26; *see also Washington v. United States, supra,* 129 U.S.App.D.C. at 39–41, 390 F.2d at 454–56. The Model Penal Code replaces the productivity construction with the more conversationally familiar word "result".

The *Durham* formula also was troublesome for its impact upon the decision-making process. It became apparent in applying its test that the intended enlightenment on the question of under what circumstances criminal conduct would be excused had been achieved at the expense of unduly blurring the necessary distinction between the function of the expert witness and the authority of the trier of fact. In its effort to encourage the experts to provide the trier with a concrete understanding of the defendant's mental condition, including their medical conclusions as to the critical relationship between the impairment and the conduct, *Durham* adopted a formulation which, as a practical matter, left little room for the scientifically naive jury to render its separate legal and moral conclusions on precisely the same factual predicates. Without impinging on the communication between the experts and the trier, the provisions of the Model Penal Code operate to restore the ultimate issue to the jury's control by reducing the artificiality of the earlier standard and broadening its focus. The connection between the mental condition and the disputed act no longer is expressed as an all-or-nothing, linear relationship (*i.e.,* did the disability produce the behavior?). The ALI standard incorporates the modifier "substantial", and provides for a less direct analysis, focusing on the relationship between the condition and the accused's behavioral controls.[26] *See United States v. Brawner, supra,* 153 U.S.App.D.C. at 13–15, 471 F.2d at 981–83.

---

**26.** Writing in dissent in *Wade v. United States, supra,* 426 F.2d at 77, Judge Trask criticized the use of the substantiality construction: "Since the definition the courts are called upon to pronounce is a legal definition, the necessity to becloud it as a palliative to the psychiatrists seems unnecessary. The modifying word creates more problems than it solves. The explanation is so mystical that it approaches the supernatural. . . . The difficulty is that the word goes too far and may well have an impact beyond that intended. How is the jury to know what 'substantial' means? How does anyone know except the user?"

We are of the contrary opinion, believing that it is the test's very capacity for "shades of gray" which supports its adoption. *See* note 25, *supra.* In addition to freeing the medical experts from a standard which can be addressed only in absolutes the substantiality construction holds promise of alleviating the improper dominance of the trier by such witnesses. We view the familiar concept of substantiality as a vehicle by which the jury may be encouraged to perform its proper role of applying the community's code of law and morality to the whole of the facts. *Cf. United States v. Brawner, supra,* 153 U.S. App.D.C. at 20–21, 471 F.2d at 988–89. If, for example, the lay trier were asked only, "is the accused ill?" it would be expected that they normally would defer to the experts' conclusions. *Cf. Frigillana v. United States,*

Such a revision of the insanity standard has not been received without criticism. It has been observed that the causal expression "result" is potentially as susceptible to "adjudication by label" as its predecessor. *See United States v. Brawner, supra,* 153 U.S.App.D.C. at 59, 471 F.2d at 1027 (Bazelon, C. J., concurring in part and dissenting in part); *cf. Campbell v. United States,* 113 U.S.App.D.C. 260, 276–77, 307 F.2d 597, 613–14 (1962) (Burger, J., dissenting). It also has been suggested that the shift from the question whether the mental abnormality produced the act to an inquiry as to whether the condition resulted in an impairment of behavioral controls (which, by implication, yielded the act), is a transparent restatement of the old formulation which will neither aid the jury nor diminish the experts' dominance. *See United States v. Brawner, supra,* at 55–62, 471 F.2d at 1023–30 (Bazelon, C. J., concurring in part and dissenting in part); *cf. Wade v. United States, supra,* 426 F.2d at 69.

We have not overlooked such criticism, nor do we suppose that the basic ALI stan-

dard represents the final resolution of these troublesome problems.[27] Nonetheless, we must pursue the development of a common plane upon which the legal, medical, and lay communities may freely exchange information without disturbing the delicate mechanism by which the judgment of responsibility is to be reached, while recognizing that such an objective can be accomplished only by careful experimentation. *Cf. United States v. Freeman, supra,* 357 F.2d at 623–25. It may be that the revision of *Durham's* language and the softening of its analytical contours will prove insufficient to reestablish the proper line between the factual predicates to criminal responsibility and the decision-making process by which the matter ultimately is to be determined. Should such an eventuality develop, further revision would be required. In the meantime, however, we are persuaded that the language of Model Penal Code § 4.01(1) represents a sufficient improvement over the *Durham* standard to warrant its substitution therefor. *See United States v. Chandler, supra,* 393 F.2d at 926–27. Accordingly, we join those jur-

---

113 U.S.App.D.C. 328, 307 F.2d 665 (1962). If, on the other hand, they were asked, "is the accused very ill?", it seems reasonable to conclude that in addition to the medical testimony they would draw upon their own knowledge and experience in making such a relativistic determination. We therefore concur with the majority conclusion that the concept of "substantiality" serves a beneficial function within the insanity analysis. *See Blake v. United States,* 407 F.2d 908, 914–15 (5th Cir. 1969) (en banc); *United States v. Freeman, supra,* at 622–23; *cf. United States v. Shapiro,* 383 F.2d 680, 686 (7th Cir. 1967) (en banc).

It should be noted that the modifier "substantial" appears in both the ALI standard and the *McDonald* definition of "mental disease or defect". We do not view this circumstance as a compounding of the legal standard or a needless duplication. *Cf. United States v. Brawner, supra,* 153 U.S.App.D.C. at 23, 471 F.2d at 991. While the *McDonald* formulation concerns the nature of the prerequisite mental condition, the ALI standard is directed toward the relationship of that condition to the condemned conduct. As these inquiries govern separate and distinct factual

predicates of exculpation, we believe that each should include the beneficial flexibility provided by the word "substantial".

27. Of considerable validity is the concern expressed by one eminent psychiatrist:

I have written elsewhere about the law's quest for certainty and its dismay over the uncertainty of the psychiatrist, usually expressed in the pontification that psychiatry is not yet an "exact science". Paradoxically, the present confusion of psychiatry in regard to some of its most basic tenets has resulted from the greatly accelerated increase of scientific knowledge about mental illness. In medicine, as in all science, certitude often reflects dogma and lack of valid information. The psychiatry of the 1970's is well advanced over that of the 1950's, but it is less usable by the law. I predict the evidentiary value of psychiatric testimony will become less, rather than more, credible in the coming decades as further increase in knowledge adds to the confusion. Diamond, *From Durham to Brawner, A Futile Journey,* 1973 Wash. U.L.Q. 109, 115.

isdictions which have adopted either its language or its fundamental principles.[28]

## IV. MODIFIED ALI STANDARD ADOPTED

■ We turn now to the specific language of the standard which we adopt for the insanity defense.[29] We make certain minor modifications in § 4.01; the standard for our court system henceforth thus will be:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect he lacked substantial capacity either to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(2) As used in this standard, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.[30]

A majority of the federal circuits has adopted the standard in the form set forth in *Brawner*.[31] Other versions have reflected modifications such as the substitution of the word "know" for "appreciate", and the use of "criminality" rather than "wrongfulness".[32] Our own modifications of the ALI's language may be explained briefly.[33]

First, while the semantic differences between "appreciate", "know", and "recognize" may be relatively slight, we find the word "appreciate" to be undesirable be-

---

28. *E. g., United States v. Brawner, supra* (D.C.Cir. 1972); *Wade v. United States, supra* (9th Cir. 1970); *Blake v. United States, supra* note 26 (5th Cir. 1969); *United States v. Smith, supra* (6th Cir. 1968); *United States v. Chandler, supra* (4th Cir. 1968); *United States v. Shapiro, supra* note 26 (7th Cir. 1967); *Pope v. United States, supra* (8th Cir. 1967); *United States v. Freeman, supra* (2d Cir. 1966); *Wion v. United States,* 325 F.2d 420 (10th Cir. 1963) (en banc), *cert. denied,* 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964); *United States v. Currens, supra* (3d Cir. 1961).

The First Circuit has issued no authoritative decision. In *Amador Beltran v. United States,* 302 F.2d 48, 52–53 (1st Cir. 1962), a case involving a conviction under a *M'Naghten* test, the *Currens* approach was commended to the trial court on remand.

29. The Supreme Court noted in *Leland v. Oregon,* 343 U.S. 790, 801, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302 (1952), that the "choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the exent to which that knowledge should determine criminal responsibility."

30. The full text of the ALI's language is as follows:
### ARTICLE 4
### RESPONSIBILITY
§ 4.01. Mental Disease or Defect Excluding Responsibility
(1) A person is not responsible for criminal conduct if at the time of such con-

duct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminalty [wrongfulness] of his conduct or to conform his conduct to the requirements of law.
(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

31. *See, e. g., United States v. Brawner, supra,* 153 U.S.App.D.C. at 23–24, 471 F.2d at 991–92; *Wade v. United States, supra,* at 71; *Blake v. United States, supra,* note 26, at 916; *United States v. Chandler, supra,* at 926; *United States v. Shapiro, supra* note 26, at 684; *United States v. Freeman, supra,* at 622.

32. For additional views on these semantic variations, *see Wion v. United States, supra* note 28, at 424–30; *United States v. Currens, supra,* at 774 n. 32; *Pope v. United States, supra,* at 735.

33. Two modifications in subsection (1) are grammatical only; we have added the article "a" before "mental disease or defect", and changed "lacks" to "lacked", since the relevant time frame is defined by the past occurrence of the charged offense. The beginning of subsection (2) was modified simply to dispense with the word "Article", which would have no meaning to a jury.

cause of its multiple connotations—including, for example, to enjoy. We believe that "recognize" will be more readily understood by jurors.

■ Second, our decision to employ the word "wrongfulness" rather than "criminality" rests upon several considerations. Initially, we agree with those courts which have concluded that the defense of insanity should not be foreclosed in all cases to those who may be fully aware of the law's requirements, but because of a delusion resulting from a mental disease or defect believe their conduct to be morally justified. *See, e.g., Wade v. United States, supra,* 426 F.2d at 71–72; *Blake v. United States,* 407 F.2d 908, 915–16 (5th Cir. 1969) (en banc); *United States v. Freeman, supra,* 357 F.2d at 622 n.52. *Cf. Chase v. United States,* 468 F.2d 141, 148 (7th Cir. 1972). Moreover, except in such a circumstance of moral delusion, the concept of wrongfulness normally would be interpreted to embrace the more restrictive notion of criminality. As both witnesses and jurors almost invariably are laymen with respect to the law, it appears to us that an attempt to subdivide the accused's cognitive capacity into awareness of criminality as distinct from wrongfulness risks confusion and may detract from the proper inquiry of whether the defendant had the general capacity to appreciate the nature and quality of his acts.[34]

■ As noted, we adopt today the substance of section 4.01(2) of the ALI's Model Penal Code, which has been accepted by four of the federal circuits.[35] The government joins the proponents of that provision who contend that it is necessary to reduce the likelihood of the improper exculpation of defendants who are free of mental disease or defect but who "knowingly and deliberately seek a life of crime."[36] *United States v. Freeman, supra,* 357 F.2d at 625. The core of their argument is

34. The "wrongfulness" construction has been adopted by the following federal courts: *United States v. Brawner, supra,* 153 U.S. App.D.C. at 23–24, 471 F.2d at 991–92; *Wade v. United States, supra,* at 71–72 (9th Cir.); *Blake v. United States, supra,* at 915–16 (5th Cir.); *United States v. Smith, supra,* at 727 (6th Cir.); *United States v. Shapiro, supra* note 26, at 686 (7th Cir.); *United States v. Freeman, supra,* at 622 (2d Cir.). *See also United States v. Frazier,* 458 F.2d 911, 918 & n. 7 (8th Cir. 1972) (en banc); *United States v. McGraw,* 515 F.2d 758 (9th Cir. 1975).

35. *Blake v. United States, supra* (5th Cir.); *United States v. Chandler, supra* (4th Cir); *United States v. Freeman, supra* (2d Cir.); *United States v. Currens, supra* (3d Cir.). *But see Wade v. United States, supra,* at 73 (9th Cir.); *United States v. Smith, supra,* at 727 n. 8 (6th Cir.).

36. The *Brawner* court declined to include the provision in the instructions to the jury on the grounds that the *McDonald* definition of "mental disease or defect" adequately forecloses the possibility of exculpation for mere sociopathy. *See Williams v. United States,* 114 U.S.App.D.C. 135, 137, 312 F.2d 862, 864 (1962), *cert. denied,* 379 U.S. 982, 85 S.Ct. 689, 13 L.Ed.2d 572 (1965). However, the circuit court did not reject the underlying principles of § 4.01(2); rather, it took the unique position of adopting it as an evidentiary guide for the trial judge. The court stated in part (153 U.S.App.D.C. at 26, 471 F.2d at 994):

> The introduction or proffer of past criminal and anti-social actions is not admissible as evidence of mental disease unless accompanied by expert testimony, supported by a showing of the concordance of a responsible segment of professional opinion, that the particular characteristics of these actions constitute convincing evidence of an underlying mental disease that substantially impairs behavioral controls.

We believe such a course to be unsound. In the first instance, such a rule invites confusion over the issues of (1) what constitutes a "responsible segment of professional opinion", and (2) what manner of demonstration would suffice to be "convincing". The inherent ambiguities in such collateral lines of inquiry would unnecessarily tax the finite resources of both the prosecution and the defense, and would place the medically-naive court in the awkward position of having to resolve questions of admissibility according to the variable yardstick of a fluid and evolving science. *Cf. Overholser v. O'Beirne,* 112 U.S.App.D.C. 267, 271–72 & n. 9, 302 F.2d 852, 856–57 & n. 9 (1961). Moreover, to the extent that the standard goes beyond the court's traditional responsibility to confine the proof to evidence which is relevant and competent,

that to permit an exculpating impairment to be established by a showing of no more than continuing sociopathic behavior would threaten to truncate improperly the issue of responsibility through the syllogistic absurdity that "normal people do not break laws; defendant has broken the law; therefore defendant is abnormal (and should be excused)." *Cf. Campbell v. United States, supra,* 113 U.S.App.D.C. at 272 n.10, 307 F.2d at 609 n.10 (Burger, J., dissenting).

 A further justification for the language of § 4.01(2) is its inherent inducement to a more complete exposition of the psychiatric circumstances surrounding the asserted disability. *See United States v. Freeman, supra,* 357 F.2d at 625. While the caveat requires no more than that there be some demonstrable dimension to the alleged impairment beyond the simple fact of criminal behavior, the distinction is significant. It is not enough that an expert witness is satisfied that an illegal act alone conclusively establishes a mental illness or defect. Without more, such a determination would come too close to the ultimate question of responsibility. While the witness is competent to express his medical conclusions as to the existence of a cognizable disability and its relationship to the defendant's criminal behavior, the ultimate issue belongs to the trier of fact. It is therefore incumbent upon the expert witness to provide the trier with more than a bare conclusion resting on the single obvious "symptom" of a pattern of antisocial conduct. *See generally Washington v. United States, supra,* 129 U.S.App.D.C. at 36–39, 390 F.2d at 451–54. The expert

must inform the jury as to the bases for his conclusions as well as the nature of the disability, its characteristics, and its symptomatology. *See Carter v. United States, supra,* 102 U.S.App.D.C. at 236, 252 F.2d at 617. Such information is necessary to provide the jury with a proper perspective of the accused's mental condition as measured against both the standards established by the law and the community's values. We adopt § 4.01(2) in the belief that it will encourage the type of communication which properly should provide the foundation for the resolution of the exculpation issue.

 We specifically retain the *McDonald* definition of "mental disease or defect" as an integral part of the ALI standard. *See* note 11, *supra.* We also reaffirm the essential principles expressed in the *Carter* and *Washington* cases (discussed below) as a necessary bulwark against the tendency of the analytical fulcrum of the responsibility issue to shift from the jury to the witnesses. Underlying those decisions was an effort to preserve for the trier its proper authority by emphasizing that neither the presence of medical issues nor the complexity of psychiatric terminology should be permitted to obscure the fact that the ultimate question of responsibility is to be determined through conventional legal analysis. Thus, for example, while the standard now asks not whether the act was a product of the impairment, but whether the impairment resulted in the absence of a substantial capacity to obey the law, that aspect of the jury's analysis which focuses on the relationship between the asserted disability and such capacity properly may be cast in the law's traditional molds of causality.[37]

we perceive an unwarranted intrusion on the jury's authority to determine the proper weight to be accorded the testimony proffered by the parties. Within the limits defined by the conventional rules governing the qualification of expert witnesses and the admissibility of evidence, a full flow of information from such witnesses to the jury should be encouraged. *See United States v. Brawner, supra,* 153 U.S.App.D.C. at 15, 471 F.2d at 983.

In our view, proper cross-examination is a sufficient guard against the possibility of the proof's factual or scientific infirmity. We believe it is vastly preferable to treat the problem with a jury instruction, rather than to adopt the concept of § 4.01(2) as a rule of evidence.

37. The ALI standard does not abrogate the need to establish a connection between the im-

We agree with the *Brawner* court's conclusion that the dilemma of encouraging a maximum of informational input from the expert witnesses while preserving to the jury its role as trier of fact cannot be resolved by the simple expedient of barring the use of certain words or terminology. *See* note 22, *supra.* The attempt in *Washington* to avoid what has been characterized as "adjudication by label"—by creating a blacklist of forbidden phrases—has proved ineffective, and often counterproductive. The adjudicatory process encourages a creative intelligence in its participants which quickly seizes upon alternative means of communicating the same ideas. If the response to the problem were to be merely to lengthen the list of prohibited speech, both the quantity and the quality of the information essential to the jury's deliberations would be impaired. To restrict further the modes of communication would result in a diminution of a witness' ability to relate fully his observations and conclusions, and, as the lawyers and experts attempt to conform to language prohibitions, likely would result in the testimony becoming increasingly artificial and incomprehensible to the lay trier. We therefore conclude that the witnesses should be free to testify directly in an unrestricted manner concerning all relevant matters to which their competence extends, including their conclusions as to the existence of a mental impairment and its relationship to the condemned behavior. *See United States v. Brawner, supra,* 153 U.S. App.D.C. at 14–15, 38–39, 471 F.2d at 982–83, 1006–07.

While we thus conclude there should be no ban on expressions of causality, we retain in all other respects the instructions to the expert witnesses (given prior to their testifying) promulgated in *Washington v. United States, supra,* 129 U.S.App.D.C. at 42–43, 390 F.2d at 457–58. We also reaffirm that decision's direction that the trial court carefully supervise the testimony and examination of such witnesses in an effort to ensure that the factual bases for their proffered conclusions are aired fully in a manner which is comprehensible to laymen. *Id.* at 39–40 nn. 30 & 31, 390 F.2d at 454–55 nn. 30 & 31 [quoting *Campbell v. United States, supra,* 113 U.S.App.D.C. at 277–78, 307 F.2d at 614–15 (Burger, J., dissenting)]. *See also United States v. Brawner, supra,* 153 U.S. App.D.C. at 50 n.21, 471 F.2d at 1018 n.21 (Bazelon, C. J., concurring in part and dissenting in part).

Finally, the charge to the jury must include unambiguous instructions emphasizing that regardless of the nature and extent of the experts' testimony, the issue of exculpation remains at all times a legal and not a medical question. *Cf. Holloway v. United States,* 80 U.S.App.D.C. 3, 5, 148 F.2d 665, 667 (1945), *cert. denied,* 334 U.S. 852, 68 S.Ct. 1507, 92 L.Ed. 1774 (1948); *United States v. McCracken,* 488 F.2d 406, 412 (5th Cir. 1974); *United States v. Currens, supra,* at 765 n.20. The charge should leave no doubt that it is for the jury alone to determine (1) the existence of a cognizable mental disease or defect, (2) whether such a disability resulted in a

---

pairment and the act. The causal analysis simply has been modified from the blunt inquiry of whether the asserted disability produced the unlawful act, to the question whether the mental condition resulted in a substantial diminution of the accused's capacity to recognize the nature of his conduct or to control his behavior (*i. e.,* his general ability to obey the law at the time of the act). Absent a demonstrable relationship between the mental disease or defect and the condemned behavior, the fact of impairment alone is insufficient for exculpation. *See United States v. Smith, supra,* 404 F.2d at 727;

*United States v. Currens, supra,* 290 F.2d at 775. Despite this more indirect form of causal inquiry, the general principle underlying the *Durham* court's guidance to the jury remains valid (94 U.S.App.D.C. at 241, 214 F.2d at 875): "[Y]our task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act." (Footnote omitted.) *Cf. Carter v. United States, supra,* 102 U.S.App.D.C. at 234–35, 252 F.2d at 615–16.

substantial impairment of the accused's capacity to obey the law, and consequently (3) whether there existed a sufficient relationship between the mental abnormality and the condemned behavior to warrant the conclusion that the defendant should not be held responsible for his acts.[38] We are confident that with adequate guidance as to the nature of their task and the scope of their authority, the jurors properly will discharge their responsibilities.[39]

## V. THE REJECTION OF THE DOCTRINE OF "DIMINISHED RESPONSIBILITY"

Appellant also contends that it was error for the trial court to refuse to instruct the jury "that the testimony introduced on the issue of insanity could be considered on the issues of premeditation, deliberation, and malice." His argument rests upon the circuit court's announcement in *United States v. Brawner, supra,* 153 U.S.App.D.C. at 30–34, 471 F.2d at 998–1002, that henceforth expert medical testimony concerning a defendant's mental abnormality might be admissible, irrespective of a defense of insanity, for purposes of determining the existence of the mens rea required for the charged offense.[40] We conclude that the trial court was not bound by *Brawner's* concept of diminished responsibility, and that adoption of its principles would be unwarranted.[41]

38. The issue of the accused's possible exculpation on the grounds of insanity does not arise unless and until the government has proved beyond a reasonable doubt all of the elements of the charged offense. Given such proof, however, D.C.Code 1973, § 24–301(j) places upon the accused the burden of establishing by a preponderance of the evidence his defense of insanity. It therefore falls to the defendant to demonstrate both the existence of a cognizable mental disease or defect and the necessary relationship of such a disability to either his awareness of the requirements of society's code of behavior or his ability to conform his conduct thereto. *See* Part VI of this opinion, *infra.*

39. Implicit in our treatment of these issues is our recognition that the law rejects the deterministic theory of individual behavior. *See United States v. Brawner, supra,* at 27, 471 F.2d at 995. While that theory has some adherents, the notion that a person's conduct is a simple function of extrinsic forces and circumstances over which he has no control is an unacceptable contradiction of the concept of free will, which is the *sine qua non* of our criminal justice system. *See United States v. Chandler, supra,* 393 F.2d at 929. We reaffirm the law's fundamental presumption that regardless of possible environmental misfortune or deprivation, each person is possessed of the capacity to choose his course of conduct. As expressed in *United States v. Currens, supra,* at 773:

It is only through [the assumption that each individual has the capacity of choice or control over his behavior] that society has found it possible to impose duties and create liabilities designed to safeguard persons and property.

*See also Carter v. United States, supra,* 102 U.S.App.D.C. at 235, 252 F.2d at 616.

40. It does not appear that either party had placed the diminished capacity doctrine in issue in *Brawner*; moreover, the trial judge had ruled that the government presented insufficient evidence on the question of "deliberation", and therefore had directed a verdict of acquittal on the charge of first-degree murder. *Id.,* 153 U.S.App.D.C. at 7, 471 F.2d at 975. Thus, the acceptance of the doctrine in *Brawner* was dicta. The circuit court declared that it was appending the doctrine to its holding on the insanity standard "[f]or sake of clarity, and to obviate misunderstanding and unnecessary litigation." *Id.* at 27, 471 F.2d at 995. *See United States v. Peterson,* 166 U.S.App.D.C. 75, 509 F.2d 408 (1974).

41. Judge Leventhal, the learned author of the *Brawner* opinion, has criticized the use of the expressions "diminished responsibility" and "partial responsibility" as abbreviated characterizations of the doctrine (*id.,* 153 U.S. App.D.C. at 30 & n. 52, 471 F.2d at 998 & n. 52):

Some of the cases following this doctrine use the term "diminished responsibility," but we prefer the example of the cases that avoid this term . . . for its convenience is outweighed by its confusion: Our doctrine has nothing to do with "diminishing" responsibility of a defendant because of his impaired mental condition, but rather with determining whether the defendant has the mental state that must be proved as to all defendants. . . .

Our doctrine is different from the doctrine of "partial responsibility" that permits a jury to find that a defendant's mental condition was such that he is only "partly responsible", and therefore entitled to a verdict reducing the degree of the offense.

Prior to *Brawner,* the circuit court in this jurisdiction consistently had rejected the argument that, short of the question of complete exoneration under a defense of insanity, expert medical evidence should be admitted toward negating the mental state requisite for a conviction.[42] In *Fisher v. United States,* 80 U.S.App.D.C. 96, 149 F. 2d 28 (1945), *affirmed,* 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), the circuit court upheld a denial of instructions which would have applied the evidence of mental abnormality toward the existence of specific intent.[43] The court stated (*id.* at 97, 149 F.2d at 29):

> The instruction confuses the issue of insanity with the question whether the psychopathic characteristics of the appellant prevented him from forming the deliberate intent necessary to constitute first degree murder.

While the court acknowledged that the law's requirement of a morally absolute

While we concur in the distinction drawn as to "partial responsibility," we do not agree with the conclusion that the doctrine (*i. e.,* the admission of expert evidence on the issue of mens rea) has "nothing to do with 'diminishing' responsibility of a defendant . . . ." As will be developed more fully *infra,* the traditional doctrine of mens rea involves the operation of certain presumptions as to the uniform capacity of all individuals to form and possess the same types and degrees of intent. The introduction of expert testimony on the issue of mens rea (other than through the separate defense of insanity) conflicts with established doctrine, and suggests a variable standard of responsibility, which properly may be characterized as "diminished" for those whose capacities are impaired (*i. e.,* below average) but whose handicap is not so severe as to be considered "insanity".

Moreover, we note that the circuit court itself has used the terms "diminished capacity" and "diminished responsibility" to connote the admissibility of expert evidence of the accused's mental abnormalities for the specific purpose of negativing the required mens rea. *See, e. g.,* Stewart v. United States, 129 U.S. App.D.C. 303, 304–05, 394 F.2d 778, 779–80 (1968). For the purpose of consistency as well as convenience, we adhere to such a usage. *See also* Model Penal Code § 4.02 (Final Draft, 1962).

We stress the importance of recognizing the manner in which the term "diminished capacity" is used in this opinion, as it is clear from the subsequent case law that some confusion has followed *Brawner. See, e. g., United States v. Masthers,* 539 F.2d 721 (D.C. Cir., 1976, dissent by Robb, J., at 723), and the related order in the same case dated June 15, 1976, in both of which a minority of the court (four judges in the latter order), in reliance upon the pre-*Brawner* cases of *McDonald v. United States, supra,* and *Stewart v. United States,* 107 U.S.App.D.C. 159, 275 F.2d 617 (1960) (en banc), *rev'd on other grounds,* 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed. 2d 84 (1961), contend that the circuit has not yet embraced the theory of diminished responsibility. *See also United States v. Demma,* 523 F.2d 981, 986–87 & n. 14 (9th Cir. 1975), which cites *Brawner* for the proposition that "[t]he use of expert testimony for [demonstrating an incapacity for specific intent] is entirely distinct from the use of such testimony to relieve a defendant of criminal responsibility based on the insanity defense or one of its variants, such as diminished capacity."

42. Both appellant and the government have cited numerous state and federal decisions as support for their opposing arguments concerning the merits of the diminished capacity doctrine. The relationship of expert testimony to mens rea has received increased attention in recent years, and there is support on both sides of the issue. *See* Annot. 22 A.L.R.2d 1228 (1968); *see also United States v. Brawner, supra,* 153 U.S.App.D.C. at 32–33, 471 F.2d at 1000–01.

43. Fisher was charged with first-degree murder under the antecedent to the statute at bar. D.C.Code 1940, § 22–2401. Expert testimony had described Fisher as a "psychopathic personality of the predominantly aggressive type of behavior, and with an apathetic reaction to emotional situations." 80 U.S.App.D.C. at 97, 149 F.2d at 29. While such a condition was insufficient under the then-applicable standard for the insanity defense (*M'Naghten* plus irresistible impulse; *see Smith v. United States, supra* note 17), Fisher requested the following instruction (80 U.S.App.D.C. at 97, 149 F.2d at 29): "The jury is instructed that in considering the question of intent or lack of intent to kill on the part of the defendant, the question of premeditation or no premediation, deliberation or no deliberation, whether or not the defendant at the time of the fatal acts was of sound memory and discretion, it should consider the entire personality of the defendant, his mental, nervous, emotional and physical characteristics as developed by the evidence in this case."

conclusion of responsibility is ill-adapted to contemporary psychiatric theories, it nonetheless concluded that the traditional principles of criminal culpability should not be disturbed (*ibid.*):

> [I]t is obvious that brutal murders are not committed by normal people. To give [such] an instruction . . . is to tell the jury that they are at liberty to acquit one who commits a brutal crime because he has the abnormal tendencies of persons capable of such crimes. [Footnote omitted.]

The Supreme Court affirmed, principally on the ground that such matters are for local determination. It stated (328 U.S. at 473 and 476, 66 S.Ct. at 1323 and 1324):

> [W]e think it is the established law in the District that an accused in a criminal trial is not entitled to an instruction based upon evidence of mental weakness, short of legal insanity, which would reduce his crime from first to second degree murder.
>
> \* \* \* \* \* \*
>
> For this Court to force the District of Columbia to adopt such a requirement in criminal trials would involve a fundamental change in the common law theory of responsibility. . . . Such a radical departure from common law concepts is more properly a subject for the exercise of legislative power or at least for the discretion of the courts of the District.[44]

 Despite the major changes in the law of insanity wrought by *Durham* and its progeny, the rejection of the diminished

capacity doctrine has withstood numerous challenges. *See, e.g., Stewart v. United States,* 94 U.S.App.D.C. 293, 297, 214 F.2d 879, 883 (1954); *Stewart v. United States,* 107 U.S.App.D.C. 159, 166, 275 F.2d 617, 623 (1960) (en banc), *rev'd on other grounds,* 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed. 2d 84 (1961); *Stewart v. United States,* 129 U.S.App.D.C. 303, 304-05, 394 F.2d 778, 779-80 (1968). As recently as two months before the circuit court announced its decision in *Brawner,* it reaffirmed the *Fisher* rule. *United States v. Bryant,* 153 U.S.App.D.C. 72, 78, 471 F.2d 1040, 1046 (1972), *cert. denied,* 409 U.S. 1112, 93 S. Ct. 923, 34 L.Ed.2d 693 (1973). Thus, under the previously discussed principles of *M.A.P. v. Ryan, supra, Fisher* remained valid precedent in our court system on the issue of the admissibility of expert testimony concerning appellant's mens rea.

 We are convinced that the principles of diminished capacity should not be incorporated into our rules of criminal adjudication. In support of the doctrine, appellant relies heavily on the rationale of the *Brawner* court's dicta on the subject, the principal theme of which may be characterized as logical relevance. The court began with the premise (153 U.S. App.D.C. at 30, 471 F.2d at 998):

> An offense like deliberated and premeditated murder requires a specific intent that cannot be satisfied merely by showing that defendant failed to conform to an objective standard. [Footnote omitted.]

It then reviewed the case law concerning the defense of voluntary intoxication,[45]

44. Within the limitations prescribed by constitutional principles [*see, e. g., In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed. 2d 368 (1970)], the Court has reiterated its reluctance to interfere with local rules of law and evidence. *Compare Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), *with Leland v. Oregon,* 343 U.S. 790, 799, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). *See also Pernell v. Southall Realty,* 416 U.S. 363, 366, 94 S.Ct. 1723, 40 L.Ed.2d 198

(1974); *Miller v. United States,* 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *Griffin v. United States,* 336 U.S. 704, 713–18, 69 S.Ct. 814, 93 L.Ed. 993 (1949).

45. *See, e. g., Heideman v. United States,* 104 U.S.App.D.C. 128, 131, 259 F.2d 943, 946 (1958), *cert. denied,* 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959). Appellant correctly observes that the notion of an "in-

and expressed the following conclusion (*id.* at 31, 471 F.2d at 999) :

> Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility.

Pursuant to such reasoning, the court determined that the *Fisher* rule should be cast aside and the mens rea issue opened to expert testimony on an abnormal mental condition which would be insufficient for complete exoneration.

In the abstract, evidence of a mental disease or defect may be as relevant to the issue of mens rea as proof of intoxication or epilepsy, and the logic of consistency could compel a similar evidentiary rule for all such incapacitating conditions.[46] However, recognizing the unique position of the concept of insanity in the framework of criminal responsibility, and considering the substantial problems which would accrue from the adoption of the diminished capacity doctrine, we conclude that the argument of logical relevance is insufficient to warrant an abrogation of the *Fisher* rule.

Our principal objection to the *Brawner* dicta is its apparent abandonment of traditional legal theory. The essence of the diminished capacity concept embraced in that decision is that the circumstance of mental deficiency should not be confined to use as an all-or-nothing defense. *See Fisher v. United States, supra,* 328 U.S. at 491–93, 66 S.Ct. 1318 (Murphy, J., dissenting) ; *State v. DiPaolo,* 34 N.J. 279, 168 A.2d 401, *cert. denied,* 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961). Prior to *Brawner,* however, the circuit court firmly had eschewed any notion of partial insanity. In *Holloway v. United States, supra,* 80 U.S.App.D.C. at 5, 148 F.2d at 667, it stated :

> [T]o the psychiatrist mental cases are a series of imperceptible gradations from the mild psychopath to the extreme psychotic, whereas criminal law allows for no gradations. It requires a final decisive moral judgment of the culpability of the accused. For the purposes of conviction there is no twilight zone between abnormality and insanity. An offender is wholly sane or wholly insane.

*Accord, United States v. Cain,* 298 F.2d 934 (7th Cir.), *cert. denied,* 370 U.S. 902, 82 S.Ct. 1250, 8 L.Ed.2d 400 (1962).

■ The *Brawner* court avoided this troublesome distinction between law and medicine by positing the somewhat misleading premise that mens rea is not to be determined solely by objective standards. 153 U.S.App.D.C. at 30, 471 F.2d at

---

capacitating state" sufficient to preclude the existence of the necessary form of mens rea is not confined to intoxication. *See, e. g., People v. Freeman,* 61 Cal.App.2d 110, 142 P.2d 435 (1943) (epilepsy).

**46.** The unspoken assumption underlying the rationale in *Brawner* is that the separate medical and legal models of the human mind are sufficiently congruent to warrant the conclusion that expert testimony based upon the former necessarily would be relevant to the legal question of whether the accused's mental condition satisfied the concept of mens rea. We do not quarrel with the notion that psy-

chiatric testimony is of general relevance to the issue of responsibility; that is, that the ability of the accused to function normally (as defined by the medical model) will bear upon the applicability of the inferential analysis by which mens rea ordinarily is determined. Care must be exercised, however, to distinguish such general relevancy from the unwarranted additional assumption that the psychiatric sciences are capable of direct proof of the existence of the necessary mental state as defined by law. *See* Meyers, *The Psychiatric Determination of Legal Intent,* 10 J. Forensic Science 347 (1965).

998. It is true, of course, that the existence of the required state of mind is to be determined subjectively in the sense that the issue must be resolved according to the particular circumstances of a given case.[47] However, this fact may not be allowed to obscure the critical difference between the legal concepts of mens rea and insanity. *Cf.* Diamonds, *From Durham to Brawner, A Futile Journey,* 1973 Wash.U.L.Q. 109. The former refers to the existence in fact of a "guilty mind";[48] insanity, on the other hand, connotes a presumption that a particular individual lacks the capacity to possess such a state of mind. It is upon this distinction that the "logic" of the diminished capacity doctrine founders.

■■■ The concept of mens rea involves what is ultimately the fiction of determining the actual thoughts or mental processes of the accused. *See United States v. Currens, supra,* 290 F.2d at 773. It is obvious that a certain resolution of this issue is beyond the ken of scientist and laymen alike. Only by inference can the existence of intent—or the differentiation between its forms, such as general or specific—be determined. *See Banovitch v. Commonwealth,* 196 Va. 210, 216, 83 S.E.2d 369, 373 (1954); 2 Wigmore on Evidence, §§ 242, 300, 302 (3d ed. 1940); *cf.* Meyers, *The Psychiatric Determination of Legal Intent,* 10 J. Forensic Science 347 (1965). The law presumes that all individuals are capable of the mental processes which bear the jurisprudential label "mens rea"; that is, the law presumes sanity. Moreover, for the sake of administrative efficiency and in recognition of fundamental principles of egalitarian fairness,[49] our legal system further presumes that each person is equally capable of the same forms and degrees of intent. *Cf. Stewart v. United States, supra,* 107 U.S.App.D.C. at 166, 275 F.2d at 623; *United States v. Chandler, supra,* 393 F.2d at 929. The concept of insanity is simply a device the law employs to define the outer limits of that segment of the general population to whom these presumptions concerning the capacity for criminal intent shall not be applied.[50] The line between the sane and the insane for the purposes of criminal adjudication is not drawn because for one group the actual existence of the necessary mental state (or lack thereof) can be determined with any greater certainty, but rather because those whom the law declares insane are demonstrably so aberrational in their psychiatric characteristics that we choose to make the assumption that they are incapable of possessing the specified state of mind.[51] Within the range of individuals who are not "insane", the law does not recognize the readily demonstrable fact that as between individual

47. *Cf. Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

48. *See United States v. Byrd,* 352 F.2d 570, 572 (2d Cir. 1965).

49. *See, e. g., United States v. Brawner, supra,* 153 U.S.App.D.C. at 52, 471 F.2d at 1020 (Bazelon, C. J., concurring in part and dissenting in part) : "The criminal law assumes that there is a spectrum of 'normality,' and that some 'normal' people commit crimes while others do not. We cannot allow either the experts or the jury to speculate about where on that spectrum the defendant would belong if he were not mentally ill. That sort of speculation is especially pernicious because it is likely to discriminate systematically against inner-city slum residents . . . ."

50. "The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man." *Powell v. Texas,* 392 U.S. 514, 536, 88 S.Ct. 2145, 2156, 20 L.Ed.2d 1254 (1968).

51. "In criminal law 'insanity', by whatever test it may be ascertained, may be said to be that *degree or quantity* of mental disorder which relieves one of the criminal responsibility for his actions. The existence of mental disorder may well be a fact. The weight to be assigned to any single phenomenon may well be a factual problem. It is quite another thing, however, to qualify as factual the determination that a certain state of disorder *ought* to relieve one from responsibility. This is a moral, not a factual, judgment." *Sollars v. State,* 73 Nev. 248, 316 P.2d 917, 919 (1957).

criminal defendants the nature and development of their mental capabilities may vary greatly. Judge Levanthal, writing in concurrence in *United States v. Moore,* 158 U.S.App.D.C. 375, 415–16, 486 F.2d 1139, 1179–80 (en banc), *cert. denied,* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973), concluded:

> The legal conception of criminal capacity cannot be limited to those of unusual endowment or even average powers. A few may be recognized as so far from normal as to be entirely beyond the reach of criminal justice, but in general the criminal law is a means of social control that must be potentially capable of reaching the vast bulk of the population. Criminal responsibility is a concept that not only extends to the bulk of those below the median line of responsibility, but specifically extends to those who have a realistic problem of substantial impairment and lack of capacity . . . .. The criminal law cannot "vary legal norms with the individual's capacity to meet the standards they prescribe, absent a disability that is both gross and verifiable, such as the mental disease or defect that may establish irresponsibility. The most that it is feasible to do with lesser disabilities is to accord them proper weight in sentencing." [52] [Footnotes omitted.]

*See also Stewart v. United States, supra,* 107 U.S.App.D.C. at 166, 275 F.2d at 623. By contradicting the presumptions inherent in the doctrine of mens rea, the theory of diminished capacity inevitably opens the door to variable or sliding scales of criminal responsibility. *Cf. United States v. Moore, supra,* 158 U.S.App.D.C. at 381, 486 F.2d at 1145. We should not lightly undertake such a revolutionary change in our criminal justice system.

■ We recognize that there are exceptions to the basic principle that all individuals are presumed to have a similar capacity for mens rea. The rule that evidence of intoxication may be employed to demonstrate the absence of specific intent figured prominently in the *Brawner* court's advocacy of consistency in the treatment of expert evidence of mental impairment. The asserted analogy is flawed, however, by the fact that there are significant evidentiary distinctions between psychiatric abnormality and the recognized incapacitating circumstances. Unlike the notion of partial or relative insanity, conditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding. As the Ninth Circuit observed in *Wahrlich v. Arizona,* 479 F.2d 1137, 1138 (9th Cir.), *cert. denied,* 414 U.S. 1011, 94 S.Ct. 375, 38 L.Ed.2d 249 (1973):

> Exposure to the effects of age and of intoxicants upon state of mind is a part of common human experience which fact finders can understand and apply; indeed, they would apply them even if the state did not tell them they could. The esoterics of psychiatry are not within the ordinary ken.

While the rationale for the diminished capacity dicta in *Brawner* rested heavily

---

52. In *Moore,* the circuit court rejected an argument for the creation of a drug dependency defense based, *inter alia,* on the principles of diminished capacity. [We later came to the same conclusion in *Gorham v. United States,* D.C.App., 339 A.2d 401 (1975) (en banc).] Judge Levanthal's observations in *Moore* concerning the constancy of the standards governing criminal responsibility appear to be in conflict with the diminished capacity doctrine earlier embraced in *Brawner.* It was suggested in *Moore,* however, that there exist "crucial distinctions" between the conditions of drug dependency and those of mental deficiency, *e. g.,* that loss of control as a result of the latter is more suspectible to accurate verification. 158 U.S.App.D.C. at 417–21, 486 F.2d at 1181–85. Aside from the question of whether there does exist a significant difference between the evidentiary qualities of proof of addiction and that of mental abnormality, we are of the opinion that the averaging principles of the legal norm should apply regardless of the nature of the condition from which the incapacity for mens rea is to be inferred.

upon the concept of logical relevance, the court gave scant attention to the other general prerequisites to the admissibility of evidence, *i.e.*, its reliability and the balance between its probative value and its potential impact upon the other interests which are critical to the adjudicatory mechanism.[53] The responsibility for ascertaining the legal relevance of the proffered medical testimony was left to the trial judge (153 U.S.App.D.C. at 34, 471 F.2d at 1002):

> The receipt of this expert testimony to negative the mental condition of specific intent requires careful administration by the trial judge. . . . The judge will [outside the presence of the jury] determine whether the testimony is grounded in sufficient scientific support to warrant use in the courtroom, and whether it would aid the jury in reaching a decision on the ultimate issues. [Footnote omitted.]

*See United States v. Peterson*, 166 U.S. App.D.C. 75, 81–82, 509 F.2d 408, 414–15 (1974).

Quite apart from our previously expressed reservations concerning the wisdom of burdening the medically-naive court with the administration of such an ad hoc standard,[54] the degree of sophistication of the psychiatric sciences and the validity and reliability of its evidentiary product are not beyond dispute. In *Wahrlich v. Arizona, supra,* 479 F.2d at 1138, the Ninth Circuit concluded:

> [T]he state of the developing art of psychiatry is such that we are not convinced

that psychiatric testimony directed to a retrospective analysis of the subtle gradations of specific intent has enough probative value to compel its admission.

Criticism of the use of medical proof in the determination of criminal responsibility has not been confined to the case law. One source has identified the problem as:

> a) extraneous qualities of psychiatric patients—such as their socio-economic class—may substantially influence psychiatric judgments; b) judges and juries usually defer to psychiatric judgments; c) psychiatric interview procedures are unstandardized; d) it is difficult for judges and juries to evaluate the validity of individual psychiatric judgments; and e) psychiatrists and behavioral scientists who have studied the reliability and validity of psychiatric judgments almost unanimously agree that such judgments are of low reliability and validity. [Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom*, 62 Cal.L.Rev. 693, 737 (1974). *See also* Schulman, *To Be or Not To Be an Expert*, 1973 Wash.U.L.Q. 57, 57–64.]

The potential impact of psychiatric evidence in an area so critically close to the ultimate issue of responsibility cannot be minimized. The post-*Durham* struggle to preserve to the lay trier its full decision-making authority provides a clear indication of the inherent dangers in the unrestrained admission of expert testimony. *See, e.g., Washington v. United States, supra.* There is no reason to suppose that

---

53. It is somewhat puzzling that the proponents of the diminished capacity doctrine would disregard such important considerations in light of their previously expressed reservations concerning the viability of expert participation in the criminal adjudication process. *See, e. g., United States v. Alexander*, 152 U.S. App.D.C. 371, 403, 413, 471 F.2d 923, 955, 965 (Bazelon, C. J., dissenting), *cert. denied*, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972); *Washington v. United States, supra*, 129 U.S.App.D.C. at 42 n. 33, 390 F.2d at 457 n. 33.

54. *Cf. Stewart v. United States, supra,* 107 U.S.App.D.C. at 166, 275 F.2d at 624: "The problem of classifying, assessing, and analyzing the results of the application of modern psychiatry to administration of criminal law as it relates to gradations of punishment according to ,the relative intelligence of the defendant is beyond the competence of the judiciary."

the problem will be any less acute where the issue is the subtle distinction between mental states such as those reflecting specific and general intent, as opposed to the question whether there existed a mental abnormality of sufficient magnitude to be labeled insanity.

The *Brawner* court did indicate that for the time being the admission of psychiatric evidence of diminished capacity would be limited to the trial of offenses involving specific intent. 153 U.S.App.D.C. at 34 n. 75, 471 F.2d at 1002 n. 75; *cf.* Annot., 22 A.L.R.3d 1228 (1968). We are not satisfied that the rule could be confined so easily. Assuming the competency of experts to testify as to an accused's capacity for specific intent, we see no logical bar to their observations as to the possible existence or lack of malice or general intent. Moreover, it does not appear to us that the balance between the evidentiary value of medical testimony and its potential for improper impact upon the trier would vary sufficiently as between the various degrees of mens rea to warrant such an artificial distinction. *See United States v. Alexander,* 152 U.S.App.D.C. 371, 396–400, 471 F. 2d 923, 948–52 (Bazelon, C. J., dissenting),

*cert. denied,* 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972).

The issue is far from inconsequential, for the unrestrained application of the diminished capacity doctrine would have a profound impact upon both the separate defense of insanity and the statutory scheme which governs claims of irresponsibility. In the provisions of D.C.Code 1973, § 24–301, Congress struck a careful balance between the interests of the individual and those of the community.[55] While there may be superficial appeal to the idea that the standards of criminal responsibility should be applied as subjectively as possible, the overriding danger of the disputed doctrine is that it would discard the traditional presumptions concerning mens rea without providing for a corresponding adjustment in the means whereby society is enabled to protect itself from those who cannot or will not conform their conduct to the requirements of the law.[56]

Under the present statutory scheme, a successful plea of insanity avoids a conviction,[57] but confronts the accused with the very real possibility of prolonged therapeutic confinement.[58] If, however,

55. *See* S.Rep.No.1170, H.R.Rep.No.892, 84th Cong., 1st Sess. 2, 3, 16 (1955); *Collins v. Cameron,* 126 U.S.App.D.C. 306, 377 F.2d 945 (1967). Within the context of both the diminished capacity doctrine and exculpatory insanity, the rules by which we apply the principles of responsibility must serve simultaneously the legitimate concerns of the community for its security and the proper administration of its criminal justice system as well as the interests of the individual defendant. *See* S.Rep.No.93–0000 (S–1), 93d Cong., 2d Sess. 107 (1974); *see also United States v. Smith, supra,* 404 F.2d at 727. Properly viewed, the concepts of both diminished capacity and insanity involve a moral choice by the community to withhold a finding of responsibility and its consequence of punishment. Where the interests of the individual conflict with those of society, the security of the community must be considered the paramount objective. *See United States v. Freeman, supra,* 357 F.2d at 625; *see also United States v. Charnizon,* D.C.App., 232 A.2d 586 (1967).

56. The government has argued with some persuasiveness that the adoption of the Model Penal Code standard for the insanity defense will reduce the urgency of the diminished capacity argument. *Cf. Stewart v. United States, supra,* 94 U.S.App.D.C. at 297, 214 F. 2d at 883; *United States v. Haseltine,* 419 F.2d 579, 581 n. 3 (9th Cir. 1969).

57. *Cf. Rucker v. United States,* 108 U.S.App. D.C. 75, 280 F.2d 623 (1960) (a verdict of not guilty by reason of insanity means that but for the asserted insanity, the defendant was guilty as charged).

58. Under the provisions of D.C.Code 1973, §§ 24–301(d) and (e), one who is found not guilty by reason of insanity must be confined until such time as it is shown that he "has recovered his sanity [and] will not in the reasonable future be dangerous to himself or others." In the absence of unopposed certification of such recovery by the appropriate medical authorities, the person so confined must bear the burden of proof by a pre-

psychiatric testimony were generally admissible to cast a reasonable doubt upon whatever degree of mens rea was necessary for the charged offense, thus resulting in outright acquittal, there would be scant reason indeed for a defendant to risk such confinement by arguing the greater form of mental deficiency.[59] Thus, quite apart from the argument that the diminished capacity doctrine would result in a considerably greater likelihood of acquittal for those who by traditional standards would be held responsible, the future safety of the offender as well as the community would be jeopardized by the possibility that one who is genuinely dangerous might obtain his complete freedom merely by applying his psychiatric evidence to the threshold issue of intent.[60]

■ The *Brawner* court expressed satisfaction that the statutory procedures governing civil commitment would "provide a shield against danger from persons with abnormal mental condition". 153 U.S. App.D.C. at 33–34, 471 F.2d at 1001–02. *Cf. Millard v. Harris, supra,* 132 U.S.App. D.C. at 150, 406 F.2d at 968; *In re Alexander,* 125 U.S.App.D.C. 352, 372 F.2d 925 (1967). We do not share their optimism.

---

ponderance of the evidence. *See United States v. Charnizon, supra* note 55; *United States v. Brawner, supra,* 153 U.S.App.D.C. at 29–30, 471 F.2d at 997–98. *Cf. United States v. Brown,* 155 U.S.App.D.C. 402, 478 F.2d 606 (1973).

59. Clearly the more serious the psychiatric disability, the easier it would be for a defendant to refute the government's proof of the requisite mens rea. Moreover, contrary to the general objective of providing the trier with the maximum achievable understanding of the circumstances, the diminished capacity doctrine creates a dangerous incentive to present just enough medical evidence to undermine the required showing of intent. In this connection, it should be noted that although the trial court traditionally has the authority to raise an insanity defense *sua sponte,* it is unclear whether the consequence of an acquittal on the grounds of insanity would be affected by the defendant's objection to the imposition of the defense. In a recent decision, the circuit court appeared to adopt a construction of the relevant statutes which would have the effect of stripping the community of the protection afforded by the mandatory commitment provisions whenever the defense is ititiated by the trial court, irrespective of the defense's response thereto. *See United States v. Wright,* 167 U.S.App.D.C. 309, 511 F.2d 1311 (1975). In light of such uncertainty, the trial court's acknowledged authority to raise the insanity defense would be an unlikely antidote to the defense's use of the diminished capacity doctrine as a strategic ploy. *See also United States v. Bradley,* 149 U.S.App. D.C. 405, 463 F.2d 808 (1972); *Rouse v. Cameron,* 128 U.S.App.D.C. 283, 387 F.2d 241 (1967). *Compare Whalem v. United States,* 120 U.S.App.D.C. 331, 337, 346 F.2d 812, 818 (en banc), *cert. denied,* 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965).

60. The introduction of psychiatric testimony by a defendant who would elect to argue only diminished capacity (and not insanity) would present several additional problems. First, provision would have to be made to extend the pretrial notice requirements of D.C.Code 1973, § 24–301(j), to enable the government to prepare a proper rebuttal of the claim of limited mental deficiency. Second, while it is to be expected that experts would testify as to the factual bases for their medical conclusions, such testimony would provide a ready vehicle for the defendant to present his version of the disputed events without risking cross-examination. In the instant case, appellant did not take the stand, but Dr. Rubin provided a detailed—but wholly hearsay—account of appellant's version of the events leading up to and at the time of the shooting. *See* note 8, *supra.* This problem may be expected whenever the issue of the normality of the accused's mental condition is raised through the use of expert witnesses. Where the trier is to consider separately the medical evidence under a claim of insanity, the problem of confining the use of the experts' testimony to its proper ends is resolved by appropriate limiting instructions. Such a solution may not be sufficient, however, in the absence of the special defense of insanity, when the trier faces the single issue of guilt *vel non.* The necessary instructions would require that the jury be able to appreciate the subtle distinction between considering the factual account proffered by the expert in the context of providing the basis for his conclusions as to the existence of the requisite mens rea, and avoiding a reliance upon such a hearsay account to infer the presence or lack of the required intent based upon the "facts" as related by the expert witnesses.

While confinement as a result of either a plea of insanity or a civil petition turns upon the existence of a similar degree of mental impairment, there exist significant procedural differences.[61] In the criminal context, the obtaining of therapeutic confinement in lieu of conviction and punishment depends upon the accused's successfully establishing his abnormality by a preponderance of the evidence. D.C.Code 1973, §§ 24–301(d) and (j). He thereafter cannot regain his liberty until the lack of danger to himself and society either has been determined through unopposed certification by the appropriate medical authorities or such recovery is established at a hearing at which the individual would bear the burden of proof by a preponderance of the evidence. D.C.Code 1973, §§ 24–301(d) and (e). On the other hand, civil commitment under D.C.Code 1973, §§ 21–541 *et seq.*, requires that the petitioning authorities establish the dangerous abnormality by proof beyond a reasonable doubt. *See In re Hodges, supra; In re Ballay*, 157 U.S. App.D.C. 59, 482 F.2d 648 (1973). The difference between the burden and standards of proof has been justified on the quite logical ground that under normal circumstances civil commitment is directed toward a potential threat to an individual or the community, while in the context of the criminal defense, harm in fact has occurred, and the commission of the act is tacitly acknowledged. *See United States v. Brown*, 155 U.S.App.D.C. 402, 407, 478 F. 2d 606, 611 (1973); *Overholser v. Leach*, 103 U.S.App.D.C. 289, 291–92, 257 F.2d 667, 669–70 (1958), *cert. denied*, 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959). We see no justification for thwarting the legitimate policy objectives of the mandatory commitment provisions of § 24–301 by reopening the gap between the civil and criminal structures.[62] In our view, to do so would "tear the fabric of the criminal law as an instrument of social control." *Cf. United States v. Moore, supra,* 158 U. S.App.D.C. at 416, 486 F.2d at 1180 (Leventhal, J., concurring). We conclude that the potential impact of concepts such as diminished capacity or partial insanity—however labeled—is of a scope and magnitude which precludes their proper adoption by an expedient modification of the rules of evidence. If such principles are to be incorporated into our law of criminal responsibility, the change should lie within the province of the legislature. *See Stewart v. United States, supra,* 107 U.S.App.D.C. at 166, 275 F.2d at 624.

---

61. For the purpose of civil commitment, "mental illness" is defined as "a psychosis or other disease which substantially impairs the mental health of a person." D.C.Code 1973, § 21–501. This has been construed as meaning that a person is "mentally ill" if he suffers from an abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. *See Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 325 n. 17, 427 F.2d 589, 595 n. 17 (1970). There appears to be little practical difference between such a standard and that which comprises an essential part of the test for insanity as a criminal defense. *See McDonald v. United States, supra,* 114 U.S.App.D.C. at 124, 312 F.2d at 851. Thus, apart from the matter of the burden and standard of proof, if the asserted abnormality would be insufficient to give rise to a criminal defense, it seems unlikely that it would provide an adequate basis for civil commitment.

62. The current provisions of D.C.Code 1973, § 24–301(d), governing mandatory commitment, were enacted by Congress in direct response to the abrogation of the previous statutory scheme which occurred in *Bolton v. Harris*, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968). *Compare Overholser v. O'Beirne, supra* note 36; *Ragsdale v. Overholser*, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960). The committee report concurred with the concern of now-Chief Justice Burger regarding the danger of allowing criminal defendants "to have it both ways"—to escape both conviction and commitment to a hospital. *See Overholser v. O'Beirne, supra,* 112 U.S. App.D.C. at 276, 302 F.2d at 861. Accordingly, the statute was amended to meet the objections of the *Bolton* court while preserving the principle of the mandatory commitment of those who escape criminal responsibility on the ground of mental abnormality. *See* H.R.Rep.No.91–907, 91st Cong., 2d Sess. at 73–74 (1970), accompanying P.L. 91–358 (July 29, 1970).

## VI. THE CONSTITUTIONALITY OF SECTION 24–301(j)

Appellant's final argument is that the trial court erred in refusing to instruct the jury that the government had the burden of proving appellant's sanity beyond a reasonable doubt. The charge to the jury was framed in accordance with the provisions of D.C.Code 1973, § 24–301(j), which requires the accused to establish his defense of insanity by a preponderance of the evidence.[63] Appellant argues that such a requirement violates the constitutional guarantees of both due process and equal protection. We disagree.

A similar due process challenge recently was rejected by us in *Shanahan v. United States,* D.C.App., 354 A.2d 524 (1976). *See United States v. Greene,* 160 U.S.App. D.C. 21, 489 F.2d 1145 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974); *see also United States v. Naples,* 192 F.Supp. 23, 39 (D.D.C.1961), *rev'd on other grounds,* 113 U.S.App.D.C. 281, 307 F.2d 618 (1962). Nevertheless, because of the importance of the issue and the possibility that there may be some misunderstanding of the impact upon it of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), we supplement the views expressed in *Shanahan.*

In *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), the Supreme Court affirmed a conviction for first-degree murder under an Oregon statute which required the accused to establish his insanity defense by proof beyond a reasonable doubt. In rejecting petitioner's due process challenge, the Court noted that while Oregon alone imposed such a high standard, 20 other states required that the accused establish his insanity by a preponderance of the evidence.[64] It concluded (*id.* at 799, 72 S.Ct. at 1007):

> We are . . . reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of insanity since we cannot say that policy violates generally accepted concepts of basic standards of justice.

We believe that the burden imposed by § 24–301(j) plainly falls within the holding of *Leland,* and conclude that that case is dispositive of appellant's due process claim.

It has been suggested, however, that the subsequent cases of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Mullaney v. Wilbur, supra,* have cast doubt upon the present validity of the principles announced in *Leland.* In *Winship,* the Court invalidated a New York procedure which permitted a youth, charged with an act which would constitute a crime if committed by an adult, to be adjudicated a juvenile offender upon proof by a preponderance of the evidence. The Court declared (397 U.S. at 364, 90 S.Ct. at 1073):

> Lest there remain any doubt about the constitutional statute of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

In *Mullaney* (which was decided after oral argument in the instant case), the Court

---

63. The statute provides in pertinent part: "No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence."

64. The number of jurisdictions which place the burden of proof of insanity upon the accused does not appear to have declined in the years since *Leland* was decided. *See* Annot., 17 A.L.R.3d § 11 (1968, and later case service), *see also* Model Penal Code § 4.03 (Final Draft, 1962). The policy considerations supporting Congress' adoption of the rule for the District of Columbia are set forth in H.R.Rep.No.91–907, *supra* note 62, at 74. *Cf. United States v. Brown, supra* note 58.

sustained a due process challenge to Maine's statutory requirement that an individual charged with murder must prove that he acted in the heat of passion on sudden provocation in order to reduce the degree of the homicide to manslaughter. The Court observed that the consequences of conviction were significantly different depending upon the presence of such mitigating circumstances, and concluded that the principles of *Winship* could not be circumvented merely by the happenstance definition of the necessary elements of a particular offense. 421 U.S. at 697–99, 95 S Ct. 1881.

In *United States v. Greene, supra,* the circuit court flatly rejected the argument that *Winship* had undermined the Court's previous recognition of local autonomy regarding the procedure for affirmative defenses.[65] The *Greene* court sustained the constitutional validity of § 24–301(j) on the grounds that criminal responsibility does not require proof of sanity, stating (160 U.S.App.D.C. at 31, 489 F.2d at 1155):

> [S]ince sanity is not one of the elements of felony murder but lack of sanity may be interposed as a defense, Congress may

with propriety enunciate the standard of proof required of the party asserting this affirmative defense, i.e., proof by a preponderance of the evidence. That is the situation, at last unless and until *Leland* is overruled.[66]

*See Mullaney v. Wilbur, supra,* 421 U.S. at 705, 95 S.Ct. 1881 (Rehnquist, J., concurring); *Phillips v. Hocker,* 473 F.2d 395 (9th Cir.), *cert. denied,* 411 U.S. 93, 95 S.Ct. 1916, 36 L.Ed.2d 401 (1973); *People v. Patterson,* 39 N.Y.2d 288, 383 N.Y.S.2d 573, 347 N.E.2d 898 (1976).

We do not read *Mullaney* as requiring a different result. *Cf. James v. United States,* D.C.App., 350 A.2d 748 (1976). The critical distinction between the Maine rule which the Court found to be constitutionally objectionable and the instant statute is that while the former operated to create a functional presumption of the higher degree of mens rea, in the District of Columbia the issue of insanity is not to be considered by the trier until after it has concluded that the prosecution has proved beyond a reasonable doubt all of the elements of the charged offense, including the requisite intent.[67] Thus what

---

**65.** Some indication of the limits of the *Winship* rule may be gleaned from *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of a confession may be determined by the preponderance standard). *See also Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States v. Braver,* 450 F.2d 799, 803 (2d Cir. 1971), *cert. denied,* 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972).

**66.** The *Greene* court further observed: "The essential elements of the charge of felony murder do not include the proof of sanity. If that were the case, the Government would be required to produce evidence establishing sanity beyond a reasonable doubt as part of its direct case, before the defendant introduced an iota of testimony, and that is not and never has been the law." *Id.* at 31, 489 F. F.2d at 1155. Appellant attempts to distinguish Greene on the grounds that there the disputed offense was felony murder, which, it is asserted, does not require proof of a par-

ticular state of mind. This argument overlooks the fact that conviction of felony murder depends upon proof beyond a reasonable doubt of the underlying felony, which necessarily includes the specific form of mens rea required for that offense. *See United States v. Williams,* 150 U.S.App.D.C. 122, 463 F. 2d 958 (1972); D.C.Code 1973, § 22–2401.

**67.** In *Leland v. Oregon, supra,* the state required a similar two-step procedure, *i. e.,* first the jury must be satisfied that the prosecution proved beyond a reasonable doubt all of the elements of the offense (including specific intent), and only then was it to consider the defendant's proof of his insanity. 343 U.S. at 792, 795, 72 S.Ct. 1002. In the instant case, the trial judge carefully detailed the elements of first-degree murder as well as those of the lesser-included offenses of second-degree murder and manslaughter. *But see* note 8, *supra.* He repeatedly cautioned the jury that the burden remained on the government to prove such elements beyond a reasonable doubt, and instructed that the issue of insanity was not

is at issue here is not the degree of culpability (and hence the severity of the possible punishment), but rather, given the government's satisfactory showing of a complete offense, whether the wrongdoer should be excused and the punishment set aside in favor of possible therapeutic confinement. *Cf. Ashe v. Robinson,* 146 U.S. App.D.C. 220, 222, 450 F.2d 681, 683 (1971). Moreover, the two situations are further distinguished by the fundamental difference between the concepts of mens rea and insanity, to which we have addressed ourselves above. Writing in concurrence in *Mullaney,* Mr. Justice Rehnquist found the principles of *Leland* consistent with the *Winship* rule, and further explained (421 U.S. at 705–06, 95 S.Ct. at 1893):

> Although as the state court's instructions in *Leland* recognized . . . evidence relevant to insanity as defined by state law may also be relevant to whether the required *mens rea* was present, the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime. For this reason, Oregon's placement of the burden of proof of insanity on Leland, unlike Maine's redefinition of homicide in the instant case, did not effect an unconstitutional shift in the State's traditional burden of proof beyond a reasonable doubt of all necessary elements of the offense.

We reiterate our conclusion in *Shanahan v. United States, supra,* that the burden imposed by § 24–301(j) does not offend the principles of due process.[68] *Cf. Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

■ Appellant's equal protection claim also is without merit. The alleged infirmity arises from the fact that the statute fails to distinguish between federal and local offenses, and apparently conflicts with the rule adopted for federal tribunals in *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895). As we have indicated, we have no doubt as to Congress' authority to displace the *Davis* standard. *See* note 68, *supra.* Appellant's reliance on *United States v. Thompson,* 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), *cert. denied,* 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972), is misplaced, as here the disputed provisions were applied in a District of Columbia tribunal to the local offense of murder. We perceive neither the constitutional significance of the asserted variance between federal and local law, nor any basis upon which appellant is able to assert the suggested constitutional defect. We find no violation of appellant's equal protection rights in the application of § 24–301(j).

## VII. SUMMARY AND DISPOSITION

In summary, we hold that the trial court did not err in applying the *Durham-Mc-*

to be considered unless and until they concluded that the prosecution had satisfied this burden. The trial court stated in part: "You must therefore first determine whether the Government has established beyond a reasonable doubt that the defendant committed the acts constituting the alleged offenses. If the Government has failed to prove beyond a reasonable doubt any of the elements of the offenses alleged in the indictment, then you must find him not guilty. However, if you find beyond a reasonable doubt that the defendant has committed each element of the offenses charged in the indictment, then you must determine whether the defendant is not guilty by reason of insanity."

68. The *Leland* Court put to rest the argument that the holding in *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), precluded the burdening of the defendant with the proof of his mental abnormality. It declared: "[*Davis*] obviously establishes no constitutional doctrine, but only the rule to be followed in federal courts." 343 U.S. at 797, 72 S.Ct. at 1007. Thus, *Davis* cannot be read as impinging upon the authority of Congress to adopt rules such as § 24–301(j) pursuant to its exclusive jurisdiction over the District of Columbia. U.S. Const. Art. I, § 8, cl. 17. *See United States v. Greene, supra,* 160 U.S.App.D.C. at 31–32, 489 F.2d at 1155–56.

*Donald* standard to appellant's defense of insanity; that the court properly refused to instruct the jury that it might consider the limited evidence of appellant's psychiatric abnormality in determining the existence of the required mens rea; and that the instructions—given pursuant to the statutory mandate—that the accused was obliged to establish exculpating abnormality by a preponderance of the evidence did not operate to deprive appellant of his due process and equal protection rights. Furthermore, we have concluded that henceforth, properly raised defenses of insanity are to be measured against the ALI-*McDonald* standard discussed above.

■ The sole remaining questions are to which cases this standard shall be applied, and whether our modifications entitle appellant to a new trial. It is well settled that there is no fundamental impediment—constitutional or otherwise—to limiting such changes in the law to purely prospective application. *See Linkletter v. Walker,* 381 U.S. 618, 627–29, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *see also Stovall v. Denno,* 388 U.S. 293, 296–97, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967). The Supreme Court has suggested that a proper resolution of the issue turns upon a balancing of the probable effect of the change on the fairness and reliability of the factfinding process, measured against the prior reliance upon the displaced principles and the impact of retroactive application on the administration of justice. *See Stovall v. Denno, supra,* at 298, 87 S.Ct. 1967; *see generally* Annot., 10 A.L.R.3d 1371 (1968).

■ In the context of criminal responsibility, revisions of the insanity standard generally have been accorded only limited retroactivity.[69] The *Brawner* court concluded that the substitution of its version of the ALI (and *McDonald*) test for that of *Durham-McDonald* would have little effect on the frequency of acquittals by reason of insanity, and noted that in light of the number of cases in the District of Columbia involving claims of psychiatric abnormality, retroactive application would have a significant impact on our criminal justice system. 153 U.S.App.D.C. at 21, 42 n. 79, 471 F.2d at 989, 1005 n. 79. It therefore announced that the revised standard would be "effective prospectively for all trials beginning after this date." *Id.* at 42, 471 F.2d at 1005 (footnote omitted). As we reject *Brawner's* notion of diminished capacity, the chance that the former and new tests would generate inconsistent results is reduced further by the fact that in the resolution of the issues of both mens rea and insanity, the bodies of evidence presented to the trier will remain substantially unaffected. Our shift from the *Durham-McDonald* formula to that of the Model Penal Code as supplemented by *McDonald* represents not so much a change in the substantive concepts of criminal responsibility as a rephrasing of existing principles. We therefore share the circuit court's conclusion that the balance favors restricting the revised test to prospective adoption, and similarly direct its application to those trials beginning after today. *Cf. Winters v. United States,* D.C.App.,

---

**69.** While both the *Brawner* court and the Seventh Circuit confined the application of their new standards to the cases before them and all trials beginning thereafter [*United States v. Brawner, supra,* 153 U.S.App.D.C. at 42, 471 F.2d at 1005; *United States v. Shapiro, supra* note 26, at 687; *cf. Durham v. United States, supra,* 94 U.S.App. D.C. at 240, 214 F.2d at 874], the majority approach seems to permit a partial retroactivity limited to those cases which have not become "final" as of the date of the adoption of the new tests. *See, e. g., Wade v. United States, supra,* 426 F.2d at 73–74 (9th Cir.);

*Blake v. United States, supra,* 407 F.2d at 916 (5th Cir.); United States v. Smith, *supra,* 404 F.2d at 727–28 (6th Cir.). *See also United States v. Tarrago,* 398 F.2d 621 (2d Cir. 1968) (en banc). It should be noted, however, that each of these latter cases involved the considerably more substantial change of substituting the ALI principles for various *M'Naghten*-type formulations. *Brawner* is the only case of which we are aware which deals with the issue before us, namely, the effect to be given to the relatively subtle shift from *Durham-McDonald* to ALI-*McDonald*.

317 A.2d 530, 532 (1974) (en banc); *United States v. Thomas,* 146 U.S.App.D.C. 101, 111, 449 F.2d 1177, 1187 (1971).

■ In considering whether in the interest of justice we should order a retrial of this case, we note that in *Brawner* the circuit court determined that such a remedy was unwarranted. There, despite the additional factor of the potential future admissibility of psychiatric evidence on the issue of mens rea, the court concluded that the proper disposition was to remand the case to the trial court merely for a determination of "whether there [was] a substantial possibility that the jury, if instructed under [the] new rule, would have found that appellant should [have been] acquitted by reason of insanity." 153 U.S. App.D.C. at 42, 471 F.2d at 1005. In this case, however, we are of the opinion that even such limited further proceedings are unnecessary. *Cf. Winters v. United States, supra.* We have carefully examined the entire record and are convinced that appellant was not prejudiced by the application of the older standard. We further are convinced that there is virtually no likelihood that a different result would

have obtained had the jury been charged pursuant to the language of the ALI-*McDonald* formulation. *Cf. Linkletter v. Walker, supra,* 381 U.S. at ·639, 85 S.Ct. 1731; *Stovall v. Denno, supra,* 388 U.S. at 298, 87 S.Ct. 1967.

The record reflects that appellant's claim of insanity was presented fully through the testimony and cross-examination of both defense and government witnesses, and there is nothing to suggest that the quantum or quality of the evidence available to the trier might have varied significantly had the adjudication been guided by the provisions of the revised insanity standard. We are influenced by the fact that pursuant to the order of the trial court, appellant was examined under the tests of both *Durham* and *Brawner's* ALI principles, and that the staff at Saint Elizabeths found no impediment under either standard. *See* note 3, *supra.* Moreover, the charge to the jury consisted of clear and comprehensive instructions which properly explained the nature of the jurors' responsibilities and authority, and provided guidance as to *Durham's* troublesome productivity construction.[70] We are mindful that

70. The trial court carefully explained the nature of the insanity defense: "The law provides that a defendant is not criminally responsible if his unlawful act was the product of mental disease. Every man is presumed to be sane, that is, to be without mental disease, and to be responsible for his acts, and that presumption controls unless the defendant establishes by a preponderance of the evidence that he has a mental disease, and that his unlafuwl act, if he committed it, was a product of his mental disease. Mental disease includes any abnormal condition of the mind, regardless of its medical label, which substantially affects mental or emotional processes and substantially impairs behavior controls. The term 'behavior controls' refers to the processes and capacity of a person to regulate and control his conduct and his actions. In considering whether the defendant had a mental disease at the time of the unlawful act with which he is charged, you may consider any testimony in this case concerning the development, adaptation and functioning of these mental and emotional processes and behavior controls. The term 'mental disease' refers to a condition which is either capable of improving or deteriorating. The term 'product of a mental disease' means that there must have been a causal relationship between the abnormal mental condition and the unlawful act such that the act would not have been committed if the defendant had not been suffering from the disease. The fact that the defendant had a mental disease at the time of the unlawful act would not alone be sufficient to relieve him of responsibility for the crime. There must be a causal relationship between the disease and the unlawful act. The relationship between the disease and the act must be critical in its effect with respect to the act. By critical is meant decisive, terminative, causative, the idea inherent in the phrases 'because of', 'except for', 'but for which', 'effect of', 'causative factor'. That is, the disease must have made the effective or decisive difference between doing and not doing the act."

It should be noted that while the instructions employed the word "product", they also included all of the concepts and relationships which form the ALI-*McDonald* standard.

a retrospective determination of whether the same result would have accrued under slightly different circumstances can never be achieved with absolute certainty. Any significant doubts should, of course, be resolved by a remand or new trial. We are convinced, however, that the facts before us give rise to no such doubt, and we therefore conclude that appellant's conviction must be affirmed.[71]

*Affirmed.*

Statement of Associate Judge GALLAGHER of reasons for voting for rehearing en banc. Associate Judges KELLY, FICKLING and MACK join in this statement.

### Statement of Associate Judge Gallagher of Reasons for Voting for Rehearing En Banc

I am writing because of the majority's departure from this court's established procedure that only when sitting en banc may the court change important law for this jurisdiction. *See M.A.P. v. Ryan,* D.C. App., 285 A.2d 310, 312 (1971).[1] The reason for the en banc requirement in an appellate court of last resort in the jurisdiction which sits in hearing divisions scarcely needs explanation.

Just as recently as a few months ago, a hearing division of this court in *Arnold v. United States,* D.C.App., 358 A.2d 335 (1976), concluded that the long established corroboration requirement in rape cases should be discarded. Because this would establish a new and major rule in the administration of criminal justice this court then sua sponte voted to hear the case en banc and vacated the opinion of the hearing division. *Arnold v. United States, supra* at 336. We previously followed the same procedure in another case. *Franklin v. United States,* D.C.App., 339 A.2d 398, 399 (1975). Yet, when presented with the same circumstance in this case, which prompted a call for an en banc vote, a majority has decided to permit a hearing division of the court to pronounce a new rule on criminal insanity, an issue of considerable importance in the administration of criminal justice. I am unable to understand why this case should be a deviation from our established procedure,[2] and from our concurrent action in *Arnold, supra.*[3]

There is something to be said for regularity in the court's administration of its own procedures.

71. It warrants final mention that despite the mass of evidence and the extensive instructions, the jury sought no supplemental guidance from the court and, as noted, required less than three hours of deliberation to conclude that appellant was guilty of first-degree murder.

1. This, to be sure, is also the rule of the federal circuits. As Judge Robb stated recently "If we are now to change the law that action should be taken by the full court, not by way of a panel opinion and its implications." *United States v. Masthers,* 539 F.2d 721, 732 (D.C.Cir., 1976). *See also Buckley v. Littell,* 539 F.2d 882 (2d Cir. 1976).

2. While the court refers to a concurring statement in *United States v. Brawner,* 153 U.S. App.D.C. 1, 42, 471 F.2d 969, 1010 (1972), to indicate this court is not now making new law the fact remains that the circuit court in fact went en banc in *Brawner.*

3. In *Arnold,* the court had also previously decided to permit a hearing division to explore whether a new rule in rape prosecutions was indicated. When it appeared that the division had concluded it was we went en banc to decide the case. Here, we do the opposite.